UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

ARTHUR D. PRINGLE III, Plaintiff,    )
v.    )  CAUSE NO:  2:09-CV-022RM
MARISA, et al., Defendants.    )

### PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

Plaintiff, Arthur D. Pringle III, ("Pringle"), files this Response to Dock. No. 105, filed by Defendants, Sergio E. Garcia ("Sergio"); Marisa Garcia ("Marissa"); Kerusso Konstruction Kompany, LLC ("KKK, LLC"); Kerusso Real Estate, LLC ("KRE, LLC"); Kerusso Asset Management, LLC; Rehab Lending Tree, LLC ("RLT, LLC") and Kerusso Real Estate (collectively the "Sergio Defendants") and in support states the following:

### I.  Introduction

Defendants, Marisa and Sergio, through KKK, LLC and RLT, LLC fraudulently acquired funds from Pringle under the pretext of loans "earmarked" for acquiring, rehabbing, selling and renting properties.  Sergio, Marisa, and KRE, LLC were individual guarantors on the "loans." Sergio, Marisa and their companies then conspired with the remaining Defendants to fraudulently conceal and transfer properties, while diverting rents from their leases.  For example, of the seventy-seven transfers uncovered by Pringle to date, which are specifically pled in Paragraph 46 of Pringle's Complaint, thirty three of those transfers involved Alpha & Omega Real Estate LLC ("Alpha") as the transferee.  Of the 33 transfers to Alpha, 14 were made on June 16, 2008, 12 on September 2, 2008 and 7 on November 3, 2008.  See Third Amended Complaint (Docket No. 98), hereinafter "Complaint"), ¶¶ 46.Q to 46.WW.[1]  Alpha's principal member is Elva Garcia, the daughter of Sergio and Marisa.  The fraudulent transfers uncovered

---

[1] All 33 Alpha transfers occurred after Pringle made his last advance under his "loans," and before the bankruptcies stayed this case.  See Complaint ¶¶46.Q to 46.WW.  The last "loan" advance by Pringle was on May 27, 2008.  See Complaint ¶ 9.M.  Sergio, Marisa, KRE, LLC and KKK, LLC filed bankruptcy on July 10 and 21, 2009.

1

to date show a scheme to transfer properties away from the Sergio Defendants into the hands of friends and relatives to prevent Pringle and other creditors from recouping their investments.

Sergio approached Pringle for numerous "loans" as documented in Exhibits A through M of the Complaint. Sergio initially said the "loans" would fund the acquisition and rehabilitation of properties, and Sergio's allegations led to seven promissory notes between KKK, LLC and Pringle. Complaint ¶ 9.A to 9.G. Under those notes, Pringle advanced $2,470,000.00 for the acquisition and rehabilitation of properties, but to date the Sergio Defendants have failed to provide any evidence showing that KKK, LLC used the $2,470,000.00 to acquire and rehab homes. While Sergio represented to Pringle that the money would be used to make down payments on properties acquired by his entities, Sergio actually used Pringle's funds to further his Ponzi scheme by making interest payments to Pringle and others. Complaint ¶ 79.BB.v.

Sergio devised an additional scheme to defraud when he established RLT, LLC, and he informed Pringle that RLT, LLC would use Pringle's funds for loans to select buyers of properties owned by KKK, LLC and other related entities. Complaint, ¶¶ 70.HH to 70.PP. To further his scheme, Sergio created a fictitious borrower folder, which was attached as Exhibit X to the Complaint and which Sergio alleged to be a sample of RLT, LLC's borrowers. However, to date none of the Garcia Defendants have provided any evidence to show that RLT, LLC ever made a loan to any individual or entity. Through Sergio's scheme with RLT, LLC, Sergio was able to garner an additional $2,375,000.00 from Pringle. On January 31, 2009, the outstanding principal and interest on all of Pringle's loans was $5,305,272.90. Complaint, ¶¶ 10, 11 and 13. After Sergio's Entities defaulted on their loan obligations, Pringle initiated this case.

Thereafter, Sergio, Marisa, KKK, LLC, and KRE, LLC filed for bankruptcy, which stayed this case.[2] However, the debtors continued their fraudulent schemes during the bankruptcies. Fearing that most of the rents, which were collected by the debtors and paid for by the tenants in cash, would disappear if the bankruptcy court did not intervene, Pringle filed a motion to prevent use of cash collateral. Complaint, ¶¶ 132 and 133. The bankruptcy court appointed a conservator to collect the rents, and the bankruptcy court's Operating Order also prohibited the use of cash collateral without court authorization. Id. at 134 and 135.

In furtherance of their schemes to defraud creditors, Sergio, Marisa and their related companies ignored the bankruptcy court's orders. Sergio's relatives and their related companies began collecting rents directly from the tenants in violation of the bankruptcy court's conservator order. After the debtors' activities were discovered, Sergio filed a fraudulent Verified Statement to cover up the fraud. The Verified Statement asserted that the collected cash collateral was used to make repairs to the properties, but when tenants were asked about those repairs in Court under oath, the tenants testified that the repairs were never made. Complaint ¶¶ 137 to 140. The rents were pocketed by Sergio Garcia's brothers, Miguel, Manuel and David, and their company, Rental Solutions Management, LLC, while Pringle and other creditors remained unpaid.

During the bankruptcy proceedings, the Garcia Defendants remained unable to account for the $4,845,000.00 in principal that Pringle advanced to the Sergio Garcia Defendants, except for $1,000,000.00, which was seized by a third party bank and which Pringle first became aware of during the bankruptcy proceedings.[3] After Pringle confirmed his funds were not used for the

---

[2] Sergio and Marisa filed bankruptcy on July 10, 2009, Case No. 09-22828-jpk; KKK, LLC on July 21, 2009, Case No. 09-22955; and KRE, LLC on July 21, 2009, Case No. 09-2954, collectively referred to as the "Bankruptcies."

[3] First Midwest Bank seized the $1,000,000.00 CD after Sergio took $1,000,000.00 of Pringle's money to create a CD with First Midwest. Sergio then obtained a loan from First Midwest and posted the CD as collateral. Sergio's loan applications listed the $1,000,000 CD as an asset, while making no mention of his liability to Pringle. First Midwest Bank then used the $1,000,000 CD to partially offset its loans with Sergio. Complaint, ¶¶ 122 to 127.

purposes represented by Sergio, Pringle further investigated matters, which revealed additional fraud in the three pending bankruptcies. Pringle found other victims, such as Terry Baldin ("Baldin"), Adolfo Bautista ("Bautista"), Pete Livas ("Livas"), and Jonathan Petersen ("Petersen"). In particular Baldin lost $5,000 of his "investment," while Bautista lost approximately $375,000.00 of his "investment." Complaint, ¶¶ 70.I and 70.T.

This case was commenced as a lawsuit to recover on the promissory notes and loan documents, but Pringle's investigation to date has disclosed a complex scheme to defraud Pringle and others. Sergio orchestrated the scheme, and he employed the assistance of relatives and numerous friends to further his scheme. Pringle's Complaint refers to such a network of relatives and entities as the "Garcia Family," which is the enterprise in Pringle's Civil RICO Claims. Based on the information gathered to date, Pringle filed his Third Amended Complaint to recover his funds and the assets purchased with his monies that were improperly diverted by the Garcia Family in a complex scheme to defraud Pringle and others.

Each Defendant played a unique but important role in the Garcia Family operations, and their involvement is outlined in the Complaint. For example, Rental Solutions Management, LLC was a company used by Sergio and his brothers, Miguel, Manuel and David Garcia, to collect rents directly from tenants in violation of the bankruptcy court's order. Rental Solutions Management, LLC operated out of the Garcia Family headquarters at 2931 Jewett Street, Highland, Indiana. Complaint, ¶¶ 139.A.ii, 139.B.vii, 139.C.viii. Additional predicate acts arose from the fraud arising in the three bankruptcies, as explained above. Such fraud and misconduct form the basis for predicate acts relating to bankruptcy fraud. [4] Other predicate acts that form the

---

[4] After hearings in In re: Garcias and In re: KRE, LLC, the Bankruptcy Court dismissed with prejudice the bankruptcy of KRE, LLC. KRE, LLC cannot file for bankruptcy again and any properties of KRE, LLC cannot be involved in any bankruptcy proceedings, so long as they were owned by KRE, LLC or any other related insider. The Bankruptcy Court has indicated that In re: Garcias will be dismissed, but it has yet to rule on whether it will be

basis for Pringle's Civil RICO claim, arose from Sergio causing Pringle to send funds to RLT, LLC and KKK, LLC through wire transfers and the mail in furtherance of the Garcia Family's conspiracy.  The specifically pled allegations in Pringle's Complaint reveal a complex scheme to defraud Pringle alone of $4,845,000.00 in a time period of less than two years from September 15, 2006 to May 27, 2008, with another scheme invoked to transfer funds and assets away from the original debtors into the hands of other relatives and their related entities.  The above facts, specifically pled in Pringle's Complaint, refute the Sergio Defendants' allegations that "[t]his case involves a simple commercial transaction between the parties."  (See Sergio Defendants' Brief in Support of Motion to Dismiss, Dock. No. 106, P.3)

## II.  Standard

When reviewing claims sought to be dismissed under Rule 12(b)(6), a court should  "ask whether the plaintiffs can prove any set of facts supporting their claims that would entitle them to relief."  American United Logistics, Inc. v. Catellus Development Corporation, 319 F.3d 921, 925-926 (7th Cir. 2002). "Upon a motion to dismiss under Fed. R. Civ. P. 12(b)(6), plaintiff's allegations must be accepted as true.  Morgan v. Bank of Waukegan, 804 F.2d 970, 973 (7th Cir. 1986).  Moreover a court should "accept all the well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the nonmoving parties."  American United Logistics at 926.  A complaint can be dismissed for failure to state a claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with plaintiffs' allegations.  Morgan at 973.  "To survive a motion to dismiss, the complaint 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. . .. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

---

dismissed with prejudice and what, if any, restrictions will be imposed on re-filing.  KKK, LLC agreed to have its bankruptcy dismissed on terms similar to KRE, LLC, shortly before the hearing on the motion to dismiss.

draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Appert v. Morgan Stanley Dean Witter, Inc., 673 F.3d 609, 622 (7th Cir. 2012) quoting Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). All the allegations in Pringle's Complaint point to a complex fraudulent scheme aimed at obtaining well over six million dollars from Pringle and others through fraudulent "loan" transactions that subsequently concealed and diverted assets to prevent any recovery of such funds.  Because this Court must accept the facts alleged in Pringle's Complaint to be true and because such facts support a basis for Pringle to recover under his theories for relief, this Court should find that Pringle sufficiently plead all his counts for relief and deny Defendants' motion to dismiss.

## III.  Analysis
**A.      Pringle has adequately pled the elements of Indiana Fraudulent Transfers Act in Count IV of the Complaint.**

Pringle's claims under the Indiana Fraudulent Transfers Act ("IFTA") are set forth in Count IV of the Complaint.  Count IV addresses the Garcia Family's efforts to divert assets away from the Sergio Defendants and into the hands of other relatives, friends and related entities to the detriment of Pringle's collection efforts.  Pringle's Complaint alleges both actual fraud and constructive fraud under the IFTA.  "[P]arties alleging fraud under Indiana Code Section 32 must establish that 'the debtor made the transfer or incurred the obligation with actual intent to hinder, delay or defraud . . ..'" Fire Police City County Fed. Credit Union v. Eagle, 771 N.E.2d 1188, 1191, FN 3 (Ind. Ct. App. 2002) quoting I.C. 32-18-2-14.    The elements of constructive fraud under the IFTA are two-fold, (1) a debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer, and (2) the transfer was made while the debtor was either insolvent at that time or became insolvent as a result of the transfer.  See Ind. Code § 32-18-2-5 and Fire Police City County Fed. Credit Union, at 1191.

6

In the case of <u>Manning v. Wallace (In re First Financial Associates)</u>, 371 B.R. 877 (N.D. Ind. Bankr. 2007), the Northern District of Indiana Bankruptcy Court explained the distinction between actual fraud and constructive fraud.

> Indiana law recognizes two different types of fraudulent conveyances -- those which are actually fraudulent and those which are only constructively so. An "actual fraudulent conveyance" is made with the intent to hinder, delay or delay one's creditors . . .. <u>I.C. 32-18-2-14</u>. A "constructively fraudulent conveyance," on the other hand, has nothing to do with the intent or motivation surrounding the transfer. Instead, its fraudulent nature is determined solely by the circumstances of the transaction itself. A transfer is constructively fraudulent if it was made for less than reasonably equivalent value and the debtor was either insolvent at the time or became insolvent as a result of the transfer. <u>I.C. 32-18-2-15</u>. . . . In either case . . . the transfer may be avoided under Indiana law. <u>Id.</u> at 899.

To allege actual fraud, Pringle alleges 77 transfers were undertaken by Defendants "with 'actual intent to defraud' any and all creditors . . . which included Pringle. See Ind. Code § 32-18-2-14(1)." Complaint, ¶ 49. Paragraph 46 of the Complaint identifies the 77 transfers. The Complaint expressly provides that 77 transfers "were undertaken . . . without the . . . [transferors] 'receiving reasonably equivalent value in exchange for such transfers.' See Ind. Code § 32-18-2-14(2) and 32-18-2-15(2)." Complaint, ¶50. Pringle believes no consideration was given, which would support actual fraud, but Pringle has been stonewalled on discovery by Elva and Alpha. The Complaint also alleges that the 77 transfers were undertaken "while the Garcia Debtors were insolvent. See I.C. §32-18-2-15(2)(A)." Complaint, ¶ 51. Alternatively, Pringle alleges that the 77 transfers caused the "Garcia Debtors to become insolvent as a result of the transfers. See I.C. § 32-18-2-15(2)(B)." Complaint, ¶ 52. Complaint Paragraphs 54 and 55 further place the transfers in context, wherein the transferors and the transferees sought to divert assets away from Sergio and his related bankrupt entities to the detriment Pringle and other creditors of the Sergio Defendants. Using the express elements of I.C. § 32-18-2-14 and 15 and guidance from <u>Fire Police City </u>County and <u>Manning</u>, Pringle has sufficiently pled his fraudulent transfer claim.

7

The Sergio Defendants also argue that Count IV is not pled with specificity, under Fed. R. Civ. Pro. 9(b). Pringle specifically pled the "who, what, where, when and how" of the fraudulent transfers at issue. Rehab Care Group, East, Inc. v. Camelot Terrace, Inc., 2012 U.S. Dist. LEXIS 51950, 19 (N.D. Ill. 2012) (Northern District of Illinois denied motion to dismiss because Plaintiff adequately pled his fraudulent transfer claim under Illinois' version of the Uniform Fraudulent Transfers Act). The seventy-seven (77) transfers at issue are alleged in subparagraphs 46.A to 46.YYY of the Complaint. Each subparagraph provides specific details on each transfer. For example, the first transfer involving Alpha & Omega Real Estate LLC is identified in subparagraph 46.W on page 17 of Pringle's Complaint, which reads as follows:

> W.    Through a warranty deed dated September 2, 2008 and recorded with the Lake County Recorder's Office on September 3, 2008, Alpha & Omega Real Estate LLC obtained title to the property commonly known as 720 Johnson St., Gary, IN 46402; such property was previously owned by a Garcia Debtor, Kerusso Real Estate.

Subparagraph 46.W. states the "who" includes Kerrusso Real Estate LLC as grantor and Alpha & Omega Real Estate LLC as grantee. The "what" is the property at 720 Johnson St., Gary, IN 46402. The "when" was September 2, 2008, the deed date, and September 3, 2008, the recording date, and the "how" was a transfer through a warranty deed. All seventy seven transfers identified in subparagraphs 46.A to 46.YYY follow the same format as subparagraph 46.W, which specifies the "who, what, when and how." Paragraph 59 of the Complaint further identifies the "where" for all the transfers, because the transfers began at the Garcia Family headquarters located at 2931 Jewett Avenue, Highland, Indiana and ended at the Lake County Recorder's Office at 2293 N. Main Street, Crown Point, Indiana. The remaining facts are specifically pled in Paragraphs 41 to 61 of Pringle's Complaint.

In their motion to dismiss the Garcias also argue that only "debtors" can be sued for fraudulent transfers. Contrary to such arguments, I.C. §32-18-2-18 expressly provides that to the extent that a transfer is voidable in an action by a creditor under Section I.C. §32-18-2-17(a)(1), a creditor may recover against the **first transfere**e of the asset or the person who benefits from the transfer or any **subsequent transferee** other than a good faith transferee who acquired the property for value. I.C. §32-18-2-18(b). (**emphasis** added.)   A creditor may also obtain relief against a transfer and obligation that include avoidance of the transfer.   I.C. § 32-18-2-17(1). Therefore, the Garcia Defendants' arguments ignore the express language of the IFTA.

I.C. §32-18-2-18(a) provides that a transfer or an obligation is not voidable under I.C. §32-18-2-14(1) against a person who took in good faith and for a reasonable equivalent value. The transferee bears the burden to establish the good faith for value defenses. Boyer v. Crowns.Distrib., Inc., 2009 U.S.Dist. LEXIS 12393 (N.D. Ind. 2009) *confirmed in part and reversed in part on other grounds by* Boyer v. Crown Stock Distrib., 587 F.3rd 787 (7th Cir. 2009). In Hoesman v. Sheffler, 886 N.E.2d 622 (Ind. Ct. App. 2008), the Indiana Court of Appeals concluded that a debtor is not even a necessary party in a fraudulent transfer action under the Uniform Fraudulent Transfer Act. Id. at 627, which leaves no doubt that a transferee is a necessary party. The Southern District Court of Indiana further discussed whether an officer or director of first transferee can be held personally liable. Symons Int'l Group, Inc. v. Cont'l Cas. Co., 2007 U.S. Dist. LEXIS 27, 356 (S.D. Ind. 2007). The dicta in Symons makes it clear that transferees are liable unless the transferee can prove their affirmative defenses of good faith and reasonable equivalent value. In interpreting the uniform fraudulent transfer act, Ohio courts have upheld that a transferee in a fraudulent transfer claim is a necessary and proper party. Hitachi Medical Systems America, Inc. v. Branch, 2011 U.S. Dist. LEXIS 907, 111. Id. at 28. The

United States District Court in the Northern District of Illinois stated that transferees are necessary parties under the Uniform Fraudulent Transfer Act.  Sullivan v. Hochfelder, 834 F. Supp. 1036, 1037 (ND Ill. 1993).

In support of their arguments the Garcias cite to the case of Shi v. Yi, 921 N.E.2d 31 (Ind. Ct. App. 2010).  The Garcias use the Shi case to support their arguments that only debtors are subject to liability under the IFTA.  However, the Garcias' reliance on Shi is inapplicable to this case.  The Sergio Defendants fist seek to apply Shi's discussion on Ind. T.R. 9(B) to this case, but such analysis is inapplicable to this case because the Shi analysis on such rule pertained to Shi's potential common law fraud claim, a claim which is not at issue in this case.  See Shi at 37 to 38.  More importantly, Shi is also inapplicable, because there should be no dispute over who is a "debtor" under the IFTA in this case.  The Garcia Defendants mistakenly argue that only "debtors" are subject to liability under Shi's analysis of the IFTA.  However, the Garcia Defendants fail to acknowledge that Sergio, Marisa, KKK, LLC, and KRE, LLC were "debtors" under the IFTA, under the loan obligations set forth in Paragraphs 1 to 29 of the Complaint.

Shi is also inapplicable to this case because the facts in Shi are distinct from the facts of this case. In Shi, defendant, Enterprise Title ("Enterprise"), merely acted as a title company and escrow agent in the property transfers.  Enterprise argued that Shi failed to allege "and cannot prove, that Enterprise *ever paid or received funds from a grantor* or grantee of the [Property]." Id. at 35.   In Shi, Enterprise was able to escape liability because Enterprise never paid or received funds from the grantor.  Enterprise was not a grantee in the Shi case, but Complaint Paragraphs 46.A to 46.WWW list Sergio, Marisa, KKK, LLC, and Kerusso Real Estate, LLC as grantors in 77 transfers.  Elva Garcia and Alpha & Omega, LLC were grantees for many of the transfers.  Pringle's Complaint expressly provides that the 77 transfers set forth in Paragraph

46.A through 46.YYY "were undertaken by Sergio and Marissa in their individual capacity and through Kerusso Konstruction and Kerusso Real Estate with 'actual intent to hinder' any and all creditors of the Garcia Debtors, which included Pringle."  Complaint, ¶ 49.  Therefore, <u>Shi</u> cannot be relied in this case because of its factual distinctions.

Additional arguments that <u>Shi</u> creates Indiana law where only the debtor is liable under IFTA also misstate Indiana law.  Garcias claim that IFTA claims may only be brought against the "debtor" in an IFTA claim.  However, as explained above, Defendants' citation to <u>Shi</u> is taken out of context.  In <u>Shi</u> the appellate court was analyzing the case of <u>Four Seasons Mfg. v. 1001 Coliseum, LLC</u>, 870 N.E.2d 494, 511 (Ind. Ct. App. 2007) to address the issue of who is a "debtor" under  IFTA.  In <u>Shi</u>, the Appellate Court found that Enterprise was not a "debtor" liable under IFTA, because it was not a party participating in the fraudulent transfers as either grantor or grantee.  In <u>Four Seasons</u>, Four Seasons Manufacturing was found to be a "debtor" liable under IFTA because of its status as the parent company for both the grantor and grantee in the alleged fraudulent transfers.  In both <u>Shi</u> and <u>Four Seasons</u>, the courts addressed was who was a "debtor" subject to the IFTA, but neither cases provided any Indiana law that prohibits a grantee in a fraudulent transfer from being subject to liability under the IFTA.

Contrary to Defendants' arguments, Indiana case law further confirms that claims under IFTA may be properly pursued against both grantors and grantees in fraudulent transfer cases.  In <u>Rose v. Mercantile National Bank of Hammond</u>, 868 N.E.2d 772 (Ind. 2007), the Indiana Supreme Court upheld the trial court's IFTA judgment rendered against Rose and Underwood, both of which were grantees in the alleged fraudulent transfers.  Pringle requests that this Court reject the arguments presented by Defendants against Pringle's IFTA claims.

**B.**     **Pringle adequately pled Criminal Conversion in Count V of the Complaint.**

The Sergio Defendants take a different approach as to Pringle's Criminal Conversion claims under Count V of the Complaint.  As to such Count V, the Sergio Defendants claim, "A failed commercial transaction does not imply the existence of a criminal conversion or the existence of a Ponzi scheme."  The Sergio Defendants fail to cite any applicable law that would support their claims that Pringle cannot prevail on a criminal conversion claim.

Count V seeks to recover damages pursuant to I.C. §34-24-3-1 and I.C. §35-43-4-3.  I.C. §35-43-4-3 states that a person who knowingly or intentionally exerts unauthorized control over the property of another commits criminal conversion.  If  a person suffers pecuniary loss as a result of I.C. §35-43, he may recover an amount not to exceed three times the actual damages, cost of the action, and reasonable attorneys' fees.  I.C. §34-24-3-1.  Control is unauthorized where it is without one's consent.  <u>Taylor v. State</u>, 445 N.E.2d 1025 (Ind.Ct.App. 1983).

The Sergio Defendants' arguments that their transactions with Pringle were nothing more than straightforward loan transactions that failed because of a downturn in the real estate market, may have carried some weight if the Sergio Defendants could account for how Pringle's $4,845,000.00 disappeared.  The facts specifically alleged in the Complaint show that this was more than a typical commercial transaction.  The transactions involving Pringle and the Sergio Defendants were part of several fraudulent schemes headed by Sergio to defraud Pringle and others of significant funds.  Sergio knowingly and intentionally provided false information to induce Pringle into making what he believed were "investments" into Sergio's real estate activities.  In reality Sergio was operating nothing more than a classic Ponzi scheme as outlined in Paragraphs 62 to 74 of the Complaint.  Pringle's Complaint specifically outlines the fraud perpetrated by Sergio in detail.  Paragraphs 70.KK to 70.OO allege Sergio provided fictitious tax returns and borrower folders to Pringle in or around October and November of 2007 to induce

Pringle to make loans to RLT, LLC.  The tax returns and borrower folders were nothing more than fraudulent documents provided by Sergio to get Pringle's money.

Complaint Paragraphs 42 through 61 specify at least 77 properties that were transferred by the Sergio Defendants to the detriment of Creditors like Pringle.  Paragraphs 64 through 74 further identify at least three victims of Sergio's Ponzi scheme, Baldin, Bautista and Pringle.  In particular, Complaint Paragraph 69 alleges the funds received by Garcia from Pringle were used to pay creditors of the Garcia Entities and to further Sergio's Ponzi Scheme, as opposed to the acquisition and rehabilitation of homes as set forth in Paragraph 67 of Pringle's Complaint.  Therefore, the Sergio Defendants' claims that their interactions with Pringle were nothing more than legitimate business transactions are not supported by the facts pled in the Complaint.

Moreover, the Sergio Defendants' provide no legal basis for their arguments relating to Count V of Pringle's Complaint.  Indiana law confirms that Pringle may proceed under claims of criminal conversion.   In Ruse v. Bleeke, 914 N.E.2d 1 (Ind. Ct. App. 2009), the victim was Bleeke, who sued Ruse over certain investments in a partnership that was to handle the distribution of beverages.  The trial court awarded Bleeke treble damages and attorneys fees under the Indiana Crime Victim's Relief Act (the "Act"), which is the same act that Pringle seeks to recover under Count V of his complaint.  The Appellate Court upheld the trial court's judgment in a case involving a commercial transaction.  In this case, the Sergio Defendants obtained $4,845,000.00 from Pringle through Sergio's Ponzi scheme as outlined in Count V of Pringle's complaint.  In Ruse, the Appellate Court confirmed that to recover under the Act, a victim must merely prove by a preponderance of the evidence that the perpetrator exerted unauthorized control of the victim's funds.  Id. at 8.   "A person's control over property of another person is 'unauthorized' if it is exerted without the other person's consent or by creating

or confirming a false impression in the other person. I.C. § 35-43-4-1(b)(1) and (4)."  Id.  The Appellate Court further confirmed that to recover under the Act a victim must merely establish that he relied on the false impression, and the victim is not required to show that the reliance was reasonable.  Id. at 9.  The Ruse case expressly refutes the Garcia Defendants' arguments, and despite Ruse being cited in Pringle's title for Count V, the Sergio Defendants continue to ignore such case and fail to cite to any case law contrary to Ruse.

The Sergio Defendants' brief fails to provide any analysis on how Pringle's Count V falls short of the pleading requirements.  Paragraphs 70.BB.i to 70.PP set forth a number of misrepresentations on the part of Sergio, including his presentation of false tax returns, fictitious borrower folders, and sham transfers in his accounting records, which all aimed at defrauding Pringle.  Paragraph 70.DD expressly states that Pringle relied on the misrepresentations of Sergio, which resulted in Pringle transferring his funds to Sergio and his related entities.  Pringle has specifically pled the requirements to show that Sergio and his related entities obtained funds through false impressions, which led to a conversion of funds that is subject to the Act.

### C.    Pringle has adequately pled the elements of a Federal Civil RICO claim.

Pringle has also pled the requisite elements for both his federal Civil RICO claim. "RICO penalizes people who associate with or operate 'enterprises' by means of a 'pattern of racketeering activity.'"  McCool v. Strata Oil Co., 972 F2d 1452, 1464 (7th Cir. 1992) citing 18 U.S.C. § 1962(a)-(d).  "The elements of a Civil RICO claim . . . are 1) a violation of the RICO statute, including proof that the defendant has participated in a pattern of racketeering, and 2) an injury to business or property."  Id.  The violation of the RICO statute further breaks down into four elements, "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  Midwest Grinding Co. v. Spitz, 976 F2d 1016, 1019 (7th Cir. 1992).

14

As to the element of "injury to business or property," Pringle has suffered injury of property, because the total outstanding principal and interest on Pringle's loans alone is $5,305,272.90 as of January 31, 2009.  See Complaint, ¶¶ 10, 11, 27 and 146.  The "conduct" in Pringle's RICO claim arises from the Garcia Family's acquisition of funds from Pringle through their Ponzi scheme and then the subsequent scheme aimed at transferring and concealing assets to the detriment of creditors.  The enterprise is specifically identified as the "Garcia Family," whose members and their roles are identified in Complaint Paragraphs 79 to 89.  All of the Sergio Defendants are included within the Garcia Family, given their involvement in the fraudulent "loan transactions" with Pringle, the subsequent fraudulent transfers, and various other fraudulent conduct that is specifically pled in Pringle's Complaint.

The crux of Defendants' motion to dismiss falls on whether Pringle alleged with the required specificity the predicate acts needed for a "pattern of racketeering."  Fed. R. Civ. Pro. 9(b) requires a plaintiff to "at a minimum, describe the two predicate acts of fraud with some specificity and state the time, place, and content of the alleged false representations, the method by which the misrepresentations were communicated, and the identities of the parties to those misrepresentations."  Slaney v. International Amateur Athletic Federation, 244 F.3d 580, 597 (7th Cir. 2001).  The predicate acts were properly pled with the requisite specificity.

Complaint Paragraphs 86 to 184 specify numerous predicate acts.  Paragraphs 86 to 113 relate to wire and mail fraud arising from Sergio's Ponzi scheme.  Complaint Paragraphs 62 to 74 provide specific facts relating to Sergio's Ponzi scheme, which the Garcia Family operated and which caused Pringle to lose millions.  Specific misrepresentations, include Sergio's representations on "the true source of his 'interest' payments to Bautista and Baldin, when he indicated that Bautista's and Baldin's 'interest' payments were being made through large profits"

15

generated by Sergio's real estate activities by either rent or sales proceeds, when in reality they were generated by his Ponzi scheme. Complaint, ¶ 70.BB.i. Such misrepresentation was made at a face to face meeting of Pringle and Sergio around September of 2006 at a restaurant in Highland, Indiana. See Complaint, ¶¶ 70.X and Y. Using the guidance of <u>Slaney</u>, Pringle has pled "with some specificity and state the time, place, and content of the alleged false representations, the method by which the misrepresentations were communicated, and the identities of the parties to those misrepresentations." <u>Slaney</u> at 597. The misrepresentations of Sergio resulted in wire and mail fraud when Pringle gave his money to Sergio.

Both wire fraud and mail fraud are predicate acts under RICO. See 18 USC § 1961 ("As used in this chapter (1) 'racketeering activity' means . . . (B) any act which is indictable under . . . title 18, United States Code: . . . section 1341 [18 USCS § 1341] (relating to mail fraud), section 1343 [18 USCS § 1343] (relating to wire fraud) . . ..") The elements of mail and wire fraud are "(1) a scheme to defraud; (2) an intent to defraud; and (3) use of the mails or wires in furtherance of the scheme." <u>U.S. v. Leahy</u>, 464 F.3d 773, 787 (7th Cir. 2006). The Sergio Defendants also rely on the case of <u>Jepson, Inc. v. Makita Corp.</u>, 34 F.3rd 1321, 1328 (7th Cir. 1994). In <u>Jepsen</u>, the Seventh Circuit indicated that "'loose references to mailings and telephone calls' in furtherance of a purported scheme to defraud will not do." <u>Id.</u> "Instead, the plaintiff must, within reason, describe the time, place, and content of the mail and wire communications, and it must identify the parties to these communications." While the Sergio Garcia Defendants cite to the law, their memorandum disregards the specificity outlined by Pringle.

The Garcia Family's scheme to defraud as it relates to the mail and wire fraud is initially pled in Paragraphs 62 to 74, as explained above. The intent to defraud as to such mail and wire fraud is specifically pled in Paragraph 107 of the Complaint, which provides, "Sergio, Jaime and

Rehab knowingly and intentionally devised a scheme and artifice to defraud and obtain money from Pringle by means of false and fraudulent pretenses. . ..”  Complaint, ¶ 107.  As a result of the Garcia Family's scheme to defraud, Pringle ended up transferring at least $1,800,000.00 through eight separate wires as specified in Paragraphs 104 to 105 and 108 of the Complaint, and the eight wire transfer instructions relating to same are attached as Exhibit Y to the Complaint. Exhibit Y contains the Wire Transfer Instructions from Smith Barney, which provides the account numbers at issue, the amounts of money wired, the date on which each wire was made and the respective parties and their financial institutions involved in each wire.  Pringle also transferred at least $100,000.00 as a result of the Garcia Family scheme through the mail as set forth in Paragraphs 109 to 113 of the Complaint.  Exhibit Z of the complaint is a copy of the postage receipt, which confirms that the mailing took place on November 15, 2006 at the Palos Park, Illinois post office.  Paragraphs 109 to 113 further confirm that the parties involved in such mailing were Pringle and Sergio through KKK, LLC.

“[T]he time, place, and content of the mail and wire communications, and . . . the parties to these communications” are therefore all identified with specificity as required by <u>Jepson</u>. <u>Jepsen</u> at 1328.  Pringle's Complaint as it relates to the wire and mail fraud of the Garcia Family Ponzi scheme is nothing like the mail fraud allegations in <u>Jepsen</u>, where the plaintiff therein identified the general nature of the misrepresentations to the customers at issue, without any further specifics on who, what, where and when relating to such misrepresentations.  Id. at 1328. Similar predicate acts arising from additional mail fraud relating to transferred properties, bank fraud as to funds advanced by Pringle, bankruptcy fraud in recent bankruptcy filings and wire fraud as to additional documents are all specifically pled in Paragraphs 114 to 184 of the Complaint.

The Garcia Defendants further attack Pringle's Civil RICO complaint by citing cases such as Midwest Grinding Co. v. Spitz, 976 F2d 1016, (7th Cir. 1992) and Reynolds v. East Dyer Dey, 882 F.2d 1249, 1252 (7th Cir. 1989). Such cases are cited because the Sergio Garcia Defendants claim that the Garcias' involvement with Pringle, was merely a "loan transaction" that went awry, but "[a] core RICO offense would be a criminal takeover of a legitimate business which the criminal then used to launder his illegal earnings or commit further illegalities behind a facade of legitimate enterprise." Fujisawa Pharm. Co. v. Kapoor, 115 F.3d 1332, 1338 (7th Cir. 1997). In Fujisawa, Judge Posner wrote that the scope of RICO would include an example of a widow defrauded by a company initially through a Ponzi scheme using mails, then induced to make further investments into the scheme, which unfold over several years and leave her destitute. Id. Posner then went on to write that if Fujisawa, a pharmaceutical company claiming losses of $800 million were to be substituted for the elderly widow in his example, the fact patterns would be similar and Fujisawa should be allowed to pursue its civil RICO claim. Therefore, this Court should reject any attempts by the Garcias to claims that (1) the facts alleged by Pringle in his complaint were your "garden-variety business disputes" as was the case in Midwest Grinding. Pringle requests that this Court deny the Motion, as the Seventh Circuit did in Fujisawa.

**1.     The Sergio Defendants miss the mark when they allege that Pringle's complaint lumps together the defendants.**

In their Motion to Dismiss, the Sergio Defendants argue that Pringle's complaint lumps together multiple defendants without identifying which person made the misrepresentations or communication. The Sergio Defendants cite to McKee v. Pope Ballard Shepard & Fowle, Ltd., 604 F. Supp. 927, 930-931 (N.D. Ill 1985) in support of their argument relating to the lumping of defendants together. However, the allegations in Pringle's Complaint, which must be accepted

as true, refute any such arguments by the Sergio Defendants.  In <u>McKee</u> the Northern District of Illinois dismissed the plaintiff's complaint as to certain defendants because the pleadings "failed to identify any activities by Pope and Lindgren that lead to the inference of their participation in fraudulent activity."  Id. at 931.  In <u>McKee</u>, Pope was the attorney for the main perpetrator of the alleged fraud, while Lindgren was the accountant, and the Seventh Circuit held that "[t]heir acts, professional representation and the conveyance of documents, are neutral on their face."  But Pringle is not pursuing his claims against the Sergio Defendants attorneys and accountants. Pringle is pursuing his claims against Sergio, who was the primary participant and leader of the Garcia Family's fraudulent schemes, and Pringle is pursuing his claims against related individuals and entities that executed documents and actively participated in the initial scheme to acquire fraud and the subsequent scheme to fraudulently transfer assets.

The <u>McKee</u> case must also be put in context with other cases interpreting RICO.  "Where there are multiple defendants, a pleading is sufficient under Rule 9(b) when it reasonably notifies each defendant of the part he or she plays in the scheme. <u>Morgan v. Kobrin Sec., Inc.</u>, 649 F. Supp. 1023, 1028 (N.D. Ill. 1986).  "The determination of reasonableness will vary with the parties and the nature of the fraudulent scheme alleged." <u>Id.</u> While Sergio as the leader of the Garcia Family may be at the forefront of the Garcia Family's fraudulent schemes, the Complaint specifically identifies the role of each Garcia Family member to the fullest extent possible, based on the information gathered by Pringle to date.  Therefore, while some defendants are more involved in the Garcia Family operations than others, the facts alleging every one of those defendants are outlined in detail within the complaint.  For example, Paragraphs 1 through 40 relate to the initial fraud on Pringle wherein the Garcia Family acquired "loans."

Such loans involved KKK, LLC and RLT, LLC, as borrowers obtaining loans totaling $4,845,000.00.  Such loans maintained a balance of $5,305,272.90 as of January 31, 2009, with interest accruing at a per diem interest rate of $1,303.61.  However, the direct involvements of Defendants, Sergio; Marisa; Kerusso Real Estate, LLC and Kerusso Asset Management, LLC, initially comes from the fact that Sergio E. Garcia executed all the loan documents on behalf of KKK, LLC and RLT, LLC.  See Exhibits A through N and P through R attached to the complaint and incorporated within Paragraphs 1 through 40 of the complaint.  Sergio even personally guarantied certain promissory notes.  See Exhibits J, K, L, M, N.  In Exhibits I and N attached to Pringle's Complaint, Sergio, Marisa, KKK, LLC and KRE, LLC all signed as guarantors to the $2,000,000 revolving loan note and they reaffirmed their guaranty obligations through a separate Guaranty and Collateral Agreement.  Exhibits A through N and P through R of the Complaint gives a specific role for the Sergio Defendants that executed such loan documents.

Complaint Paragraph 81.I further ties in Kerusso Asset Management into the fraudulent schemes because it was a company owned by Sergio and Marisa that managed all their entities that diverted assets away from the principal borrowers.  Therefore, any action of KKK, LLC and KRE, LLC can be also attributed to its managing company, Kerusso Asset Management.  The loan documents attached as exhibits to Pringle's Complaint are another example of how specific individual defendants are tied into the Garcia Family operations, and such loan documents refute the Sergio Defendants' arguments that they are being lumped into the Garcia Family operations without showing how each Defendant is involved in the fraudulent scheme.

The details relating to fraudulent transfers are also outlined in subparagraphs R, U, X, AA, CC, EE, NN, OO, RR, SS and UU of Paragraph 46 as they relate to Marisa, as transferor. Paragraph 46, subparagraphs A to G, K, O, P, T, V, TT, VV to CCC, GGG, and JJJ to XXX

contain details on property transfers involving KKK, LLC, as transferor.  Subparagraphs S, W, Y, Z, BB, DD to MM, PP, QQ, YY, and DDD to FFF of Paragraph 46 all contain details on property transfers relating to KRE, LLC, as transferor.  The aforementioned subparagraphs contain details on the property being transferred, the location of same, the name of the grantor and grantee and the date of the transaction.  Such paragraphs identify each defendants individually, and Pringle requests that the Court reject any arguments from the Sergio Defendants that Pringle merely lumps all the defendants together.

The aforementioned subparagraphs in Paragraph 46 that relate to the fraudulent property transfers are tied into the Civil RICO claims of Pringle, because Paragraphs 114 to 121 tie in those transactions into the defendants' use of the mails through the Lake County Recorder's Office and Lake County Treasurer's Office for the mailing of deeds relating to each transfer and then the subsequent mailing of tax bills relating to properties that were transferred.  The timing of the recorded deeds for each transaction occurred eight to six weeks after the deed was recorded, which is outlined in Paragraph 117, and Paragraph 118 sets forth the specific time frame for the mailing of the tax bills.  The Sergio Defendants fail to address these specifically pled facts in the 92 pages of the Complaint containing 221 paragraphs and numerous subparagraphs.  Pringle thus requests that this Court deny Defendants' Motion to Dismiss.

**2.      Pringle also seeks to hold the defendants accountable through the defendants' conspiracy.**

Even if Pringle failed to plead with specificity the facts as to certain defendants, Civil RICO aims to attach liability to those who are conspirators as opposed to limiting liability solely to those who are perpetrators of a specific fraud.  The Seventh Circuit addresses the role of conspirators within a Civil RICO case in Gagan v. American Cablevision, 77 F.3d 951, 961 (7th Cir. 1995).

Accordingly, to prevail on his claim of conspiracy to violate §§ 1962(b) and (c), it was Gagan's burden to prove by a preponderance of the evidence:

(1) that the defendants agreed to acquire or maintain an interest in or control of an enterprise or to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity;

(2) that defendants further agreed that someone would commit at least two predicate acts to accomplish those goals.

It was not necessary for Gagan to prove the actual commission of predicate acts in order for him to prove a RICO conspiracy. Schiffels, 978 F.2d at 348. Furthermore, the defendants need not have agreed to actually commit the predicate acts themselves or even to participate in the commission of those acts so long as they agreed that the acts would be committed on behalf of the conspiracy. United States v. Quintanilla, 2 F.3d 1469, 1484 (7th Cir. 1993); United States v. Campione, 942 F.2d 429, 437 (7th Cir. 1991); United States v. Glecier, 923 F.2d 496, 500 (7th Cir.), cert. denied, 502 U.S. 810, 116 L. Ed. 2d 31, 112 S. Ct. 54 (1991). Thus, to establish a conspiracy to violate RICO, it was sufficient that Theurer and Tripp acted on the defendants' behalf; the conspiracy defendants themselves did not have to be the ones to act. Neapolitan, 791 F.2d at 498 (RICO conspiracy liability is broad enough "to encompass those persons who while intimately involved in the conspiracy, neither agreed to personally commit nor actually participated in the commission of the predicate" offenses). Id. at 961.

Based on Civil RICO law as explained in Gagan, each individual need not be linked to every single part of the conspiracy. The mere agreement to conspire on a fraudulent plan and allow some individuals to execute that plan results in everyone involved with the conspiracy to being subject to Civil RICO claims. Defendants make no attempt to refute the specific predicate acts of wire fraud, mail fraud, bank fraud and bankruptcy fraud outlined in Pringle's Complaint. The Sergio Defendants argue that certain defendants' involvement in the Garcia Family operations do not equate to the involvement of other defendants, such an argument falls short given the Seventh Circuit's direction in Gagan. "[A]ll that is required to support a RICO conspiracy violation is an agreement to acquire or maintain an interest in or control of an enterprise, or to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity." Id. at 962. "[D]efendants only had to agree to the commission of

predicate acts which themselves could form a pattern of racketeering activity; the predicate acts need not have been committed." Id. Every single defendant may not have had the same level of involvement as other defendants. Pringle's Complaint further specifically pleads the conspiracy in Paragraphs 54, 55, 81.A, 86, 103, 111, 115, 116, 139.P, 170, 173, 182, 190, 206, 211, 214.

For example, the Complaint alleges that the parties involved in the 77 fraudulent transfers "conspired to defraud creditors of the Garcia Debtors by transferring properties away from the Garcia Debtors and into the hands of the grantees . . . to prevent Pringle and other creditors from collecting . . .." Complaint, ¶55. Paragraph 170 also asserts that Sergio, Rental Solutions Management, LLC, Miguel Garcia and others conspired to conceal and receive material amounts of property from debtors, when they began collecting rents from tenants that should have been paid to the court appointed conservator. Pringle has pled the conspiracy amongst the Garcia Family members. Therefore, any arguments by the Sergio Defendants must be put in the context of the Seventh Circuit's decision in Gagan. Pringle requests that this Court apply the decision in Gagan to deny the Sergio Defendants' motion to dismiss based on the conspiracy allegations.

**3.  If Pringle was not fraudulently induced to advance $4,850,000.00, Pringle would not have been out such principal amount, and the Sergio Defendants' argument that there is no proximate cause with the acts alleged in Pringle's Complaint defies logic.**

Pringle advanced a sum of $2,470,000.00 to be used for the acquisition and rehabilitation of properties. The Sergio Defendants have failed to provide any evidence showing that KKK, LLC used the $2,470,000.00 to acquire and rehab homes. Sergio devised an additional scheme to defraud Pringle, wherein Sergio's and Elva's company, RLT, LLC, would provide "loans" to select buyers to facilitate sales using Pringle's funds. To date, none of the Garcia Defendants have provided any evidence to show that RLT, LLC ever made a loan to any individual or entity. Through Sergio's scheme with RLT, LLC, Sergio was able to garner an additional $2,375,000.00 from Pringle. On January 31, 2009, the outstanding principal and interest on Pringle's loans was

$5,305,272.90.   Complaint, ¶¶ 10, 11, and 13.   Pringle now seeks the recovery of his $5,305,272.90 amount that was outstanding on January 31, 2009, and which accrues interest at a rate of $2,557.07 for every day after January 31, 2009.

The prior sections of this brief outline how the Garcia Family operated a Ponzi scheme to get Pringle's money and then undertook a number of transfers to avoid Pringle and other creditors from recovering any of their funds.   As the Sergio Defendants cite in their brief, Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268 (1992), establishes that proximate cause in Civil RICO complaints boils down to the question, "would the claimed injury still have happened if the defendant had not engaged in the tortious conduct alleged?"   The Sergio Defendants make the bold assertion that Pringle cannot establish any relationship between his alleged injury and the alleged offenses, but no analysis is made to support such conclusion. The argument ignores Pringle's entire Complaint.   The arguments that Pringle's damages are "too remote" or "purely contingent"   further ignore the motion to dismiss standards.

**D.     Indiana Civil RICO is patterned after federal RICO, and for the same reasons cited above, Pringle adequately pled under Indiana Civil RICO.**

To attack Pringle's Indiana civil RICO claims, the Sergio Defendants cite to State v. Allen, 646 N.E.2d 965 (Ind. Ct. App. 1995) and Mendenhall v. Goldsmith, 59 F.3d 685 (7th Cir. 1995).  Both cases confirm that Indiana Civil RICO is patterned off of federal RICO.  Because of the similarities between Indiana and Federal RICO, the Sergio Defendants merely reincorporate their proximate cause argument, which they used against Pringle's federal RICO claims, as discussed above.  Without any citations to any additional law, the Sergio Defendants conclude there is no nexus between Pringle's injury and the alleged wrong doing of the Defendants.

Pringle concurs that Indiana RICO is similar to federal RICO.  Indiana RICO requires "'a pattern of racketeering activity.' I.C. 35-45-6-1. This in turn requires proof of at least two

predicate offenses." <u>Allen</u> at 968.  The only real major difference between the Indiana and federal RICO statutes is that "Racketeering activity" under Indiana RICO arises from Indiana statutes, while federal statutes are the basis for a pattern of racketeering under federal RICO.  See I.C. 35-45-6-1(e) and 18 U.S.C. 1961(1).  Because of these similarities, Pringle's Count VII first reincorporated certain facts addressed within the prior VI counts.  Pringle then used those facts relating to fraudulent transfers and bankruptcy fraud to allege predicate acts arising from fraud under I.C. § 35-43-5-4(8).  Fraud under I.C. § 35-43-5-4(8) is a predicate act under I.C. 35-45-6-1(e)(17).  Because the Sergio Defendants advance no new arguments that were not addressed in the sections above, Pringle reincorporates his arguments in support of his Federal RICO claims.  Pringle merely reiterates his concerns on how the Defendants can logically argue that there is neither a proximate cause nor a nexis between Pringle not recouping his $4,850,000.00 principal advancements and the Garcia Family operations which started with a Ponzi scheme and then turned into an effort to fraudulently transfer properties away from Pringle and other creditors.

### IV.  Conclusion

For the reasons explained above Pringle concludes that Defendants' motion to dismiss must fail, because Pringle has adequately and specifically pled the facts supporting all his claims for relief.

WHEREFORE, Pringle, by counsel, respectfully requests that this Court deny the motion to dismiss filed by Sergio Defendants, and for all other just and appropriate relief.

Respectfully submitted,
KORANSKY, BOUWER & PORACKY, P.C.
BY:_____/s/ James M. Yannakopoulos_____
JAMES M. YANNAKOPOULOS (#25164-45)
425 Joliet Street, Suite 425
Dyer, Indiana 46311
(219) 865-6700

## **CERTIFICATE OF SERVICE**

I certify that on the 27th day of August, 2012 service of a true and correct copy of the above and foregoing pleading was made upon each party or attorney of record either via email notification or depositing in envelopes properly addressed to each of them and with sufficient first class postage affixed.

KORANSKY, BOUWER & PORACKY, P.C.

/s/ James M. Yannakopoulos

JAMES M. YANNAKOPOULOS (#25164-45)

425 Joliet Street, Suite 425

Dyer, Indiana 46311

(219) 865-6700