# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

|                                    |     |                          |
|------------------------------------|-----|--------------------------|
| ARTHUR PRINGLE III,                | )   |                          |
|                                    | )   |                          |
|     Plaintiff, | )   |                          |
|                                    | )   |                          |
|     v.         | )   | Case No. 2:09-cv-022-PPS |
|                                    | )   |                          |
| MARISA GARCIA, *et al.*,           | )   |                          |
|                                    | )   |                          |
|     Defendants.| )   |                          |

## OPINION AND ORDER

Arthur Pringle claims to be the victim of an elaborate fraud scheme perpetrated by Sergio Garcia and various members of his family. The parties tell such different stories that it's hard to believe that they both reflect the same series of events. Pringle claims that the Garcia family members are a bunch of four-flushers who engaged in outright fraud – first, by luring Pringle to invest in their real estate program, then by misrepresenting where his dollars were going to be diverted, and finally by cheating their bankruptcy creditors (including Pringle) in multiple ways. His allegations are so inflammatory that they easily could support criminal charges if true. The Garcias' version of events is entirely different. They paint a picture of a real estate investment that turned sour in the face of a collapsing real estate market. According to them, there was no wrongdoing; Pringle just made a bad bet.

Two separate groups of defendants have asked me to dismiss four counts of Pringle's complaint – an Indiana fraudulent transfer claim, an Indiana criminal conversion claim, and federal and state RICO claims. They argue that Pringle hasn't pled sufficient facts to suggest that he has a plausible claim for relief. I disagree. Pringle gives a detailed account of how he was told that his investment funds were going to be used, why that was a misrepresentation, and

what he thinks that the Garcias actually did with his money after he invested. That story is specific enough to plausibly suggest that he was the victim of a massive fraud scheme. So for the reasons that I'll discuss more fully below, two pending and ripe Motions to Dismiss (DE 105; DE 113) are **DENIED**.

Finally, I note that Pringle recently filed a Motion for Leave to Refile Motion for Partial Summary Judgment asking to renew a summary judgment motion that was filed on April 2, 2012 and fully briefed on May 14, 2012. (DE 160.) Additionally, various other Garcias filed a Motion to Dismiss on January 17, 2013. (DE 175.) That Motion only became ripe on February 11, 2013 (*i.e.*, two days before this opinion was filed), so I was unable to address it in this decision.[1] Because briefing for both of these motions is either ongoing or has concluded in the past day or two, they will **REMAIN UNDER ADVISEMENT**.

## PROCEDURAL BACKGROUND

As I mentioned above, two groups of defendants have filed dismissal motions. The first consists of Sergio and Marisa Garcia and various corporate entities that they have created (all but one of them are some version of a "Kerusso" company). For ease of reference, I'll call them the "Garcia I" defendants. I'll also borrow Pringle's terminology and call the Garcia I corporate entities the "Garcia Entities." The second group of defendants consists of Elva Garcia and her company, Alpha & Omega Real Estate, LLC. I'll call them the "Garcia II" defendants.

_____

[1] Notwithstanding the fact that I'm not going to rule on the very-recently-ripe dismissal motion in this opinion, I note that it appears to raise substantially the same arguments that are set forth in the Motions to Dismiss now before me. I encourage the parties – and especially the moving defendants – to take appropriate steps if they believe that it would be a waste of this Court's time and resources for me to proceed with my consideration of that motion in light of the analysis set forth herein.

The operative complaint presently before me is the Third Amended Complaint, and it is that complaint that the two groups of defendants seek to dismiss in part pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. The first dismissal motion is brought by the Garcia I defendants, which consist of Sergio and Marisa Garcia; Kerusso Konstruction Kompany, LLC; Kerusso Real Estate, LLC; Kerusso Asset Management, LLC; and Rehab Lending Tree, LLC. (DE 105.) It asks me to dismiss the fraudulent transfer (Count IV), criminal conversion (Count V) and federal and state RICO (Counts VI and VII) claims against these defendants. (*Id.*) The second motion to dismiss is brought by the Garcia II defendants, Elva Garcia (Sergio's and Marisa's daughter) and Alpha & Omega Real Estate, LLC, a company that she owns. (DE 113.) It also asks me to dismiss the fraudulent transfer and federal and state RICO claims.[2] (*Id.*) There are a few minor differences between the two motions, but they both argue the same basic point – that Pringle has failed to plead the challenged fraud-based counts with sufficient specificity and particularity.

## RELEVANT ALLEGED FACTS

According to the factual allegations in the complaint, which I must accept as true for present purposes, Pringle made a series of loans to two entities allegedly controlled by the Garcias. (DE 98 at 3-5.) One of the entities, Kerusso Konstruction, borrowed $2.47 million from Pringle. (*Id.* at 5.) The other entity, Rehab Lending Tree, borrowed $2.375 million. (*Id.*) As of January 31, 2009, the total principal and interest owed by the companies is alleged to be around $5.3 million (*Id.* at 5-6; DE 149 at 2.)

---

[2] No criminal conversion claims are brought against the Garcia II defendants. Similarly, although the Garcia I defendants have asked me to dismiss the criminal conversion claim against Marisa, I don't read the complaint as asserting one against her. (DE 98 at 40.)

Pringle alleges that Sergio told him that the Garcias would use his funds to acquire and "rehab" properties in Northwest Indiana.  (*Id.* at 30.)  Sergio induced him to invest by telling him that two prior investors – Adolfo Bautista and Terry Baldin – had profited from similar investments in the Garcias' real estate activities.  (*Id.*)  Yet Pringle now says that these were all lies; the Garcias never used Bautista's and Baldin's funds to purchase and rehab properties.  (*Id.* at 30-34.)  Instead, he contends, they used the money both for personal uses (with respect to Baldin), and to pay interest to prior investors (with respect to Bautista) – in other words, the whole thing was something of Ponzi scheme.  (*Id.*)

Pringle gives a reasonably detailed account of various encounters in which these alleged misrepresentations were made.  He first describes a September 2006 meeting between himself, Sergio and Bautista, where (Pringle alleges) Sergio represented that Baldin's and Bautista's interest payments were being generated from his real estate activities, and not from an influx of new investors.  (*Id.* at 34-35.)  Pringle also asserts that at this initial meeting Sergio promised that his investment funds would be used to acquire additional properties to rehab and rent out or sale, and not to pay off prior investors like Baldin and Bautista. (*Id.* at 35.)

Pringle describes at least four more encounters with Sergio where he says he was told various (inaccurate) details about the proposed investment.  (*Id.* at 36-37.)  These alleged misrepresentations include the promises that the Garcias' investors could be refunded their full principal within ninety days, that the Garcias were compliant with all applicable tax requirements, that their real estate operations were generating tens of thousands of dollars in monthly income, and that no investor had ever requested a refund and been refused.  (*Id.*)  According to Pringle, all of these statements – which he says that he relied on when deciding to

invest – were false.  (*Id.*)

Pringle also describes how Sergio invited him to invest in a second and related venture, Rehab Lending Tree, which he was told was created to loan money to the purchasers of the properties acquired and rehabbed by the Garcias.  (*Id.* at 37-38.)  As part of his sales pitch, Sergio allegedly provided Pringle with two documents – a tax return and a sample borrower file – that Pringle now says were forged or otherwise falsified.  (*Id.* at 38-39.)  Pringle continues by asserting that, in fact, Rehab never made any loans to anybody, and the sample borrower's loan was quickly repaid after Pringle agreed to invest.  (*Id.* at 39.)  In any event, as noted above, Pringle was convinced that the Garcias would be a good investment opportunity, and he ended up providing them with nearly five million dollars.  (*Id.* at 39-40.)

I need to pause at this point before continuing with Pringle's chronological narrative of what the Garcias did with his money. So far, all of the allegations about specific conduct by a particular individual (*i.e.*, who did what) focus on Sergio.  Yet Pringle names a number of individuals and entities as defendants.  So what's his theory with respect those parties?  Well, according to Pringle, all of the Garcias – who generally are Sergio's relatives, companies, or companies owned by the relatives – constitute a single enterprise, which Pringle calls the "Garcia Family."  (*Id.* at 41.)  He alleges that when Sergio made the foregoing misrepresentations to Pringle, he was acting on behalf of the Garcia Family to further its goals. (*Id.* at 84-85.)

Pringle goes on throughout his complaint to identify various actions taken by each individual or entity in the enterprise.  These specific instances are far too numerous for me to recount in full, but it probably makes sense to summarize the basic allegations concerning each

of the Garcia I and Garcia II defendants (other than Sergio):

Marisa Garcia:  Pringle identifies her as Sergio's wife.  (*Id.* at 41.)  She appears throughout the complaint, primarily as a collaborator with Sergio in his various activities and as a member of various of the Kerusso entities.  (*Id.* at 2, 41.)  Perhaps most significantly, Pringle contends that she was closely involved as the grantor or transferor in many of the property transfers that form the basis for his fraudulent transfer claim.  (*Id.* at 14-26.)  He also says that Marisa signed many of the checks that allegedly were used to deplete Sergio's and Marisa's funds prior to their filing bankruptcy.  (*Id.* at 74.)

Kerusso Konstruction:  Pringle alleges that the Garcias used this entity as the chief conduit for Pringle's initial investment in the proposed rehabbing venture, and it was the entity that directly received the funds transferred by Pringle.  (*Id.* at 3-5.)

Rehab Lending Tree:  Pringle asserts that this company similarly served as the conduit for Pringle's second investment in the Garcias' loan operations (*i.e.*, loaning money to the purchasers of rehabbed properties).  (*Id.* at 4-5.)

Kerusso Asset Management:  Pringle alleges that the Garcias used the entity to manage all of their other assets and holdings, including their rental properties.  (*Id.* at 43, 64.)

Kerusso Real Estate:  Pringle claims that the Garcias used it as both a buyer and seller in many of the property transfers that are the basis for his fraudulent transfer claims.  (*Id.* at 13-26.)

Elva Garcia and Alpha & Omega:  Elva Garcia is Sergio's and Marisa's daughter. (*Id.* at 42.)  Alpha & Omega is a company owned by Elva, Sergio, and Sergio's and Marisa's son (who is also named Sergio).  (*Id.* at 44.)  Pringle says that Elva acted as the principal of Alpha & Omega.  (*Id.* at 42.)  Pringle also alleges that Alpha & Omega and Elva were the recipients of 33

of the fraudulent transfers that allegedly depleted Sergio's and Marisa's bankruptcy estate. (*Id.* at 13-26; *see also* DE 150 at 14.) Elva also was a member of Kerusso Konstruction, Kerusso Asset Management and Rehab Lending Tree. (DE 98 at 2.)

So after convincing Pringle to invest in their real estate venture, what happened to his money? Pringle contends that the Garcias didn't actually use his money to purchase and rehab properties, or to fund loans for the purchasers of those rehabbed homes. Instead, he claims, they used that money both for their own personal benefit and then to pay prior investors when they came looking for their money back. (DE 98 at 30-34.)

And if you believe Pringle, the shenanigans do not stop there. Pringle further asserts that the Garcias have engaged in widespread bankrutpcy fraud by transferring properties for inadequate consideration in the years and months before Sergio and Marisa declared bankruptcy. (*Id.* at 12-29.) He identifies at least 77 specific transactions[3] that he says fall into this category. (*Id.* at 12-26.) Pringle also pleads a second, independent bankruptcy fraud theory. He alleges that after Sergio's and Marissa's bankruptcy filing, various of the Garcias began collecting rents from their tenants without turning over those funds to the court-appointed conservator. (*Id.* at 57-65.) There are at least seven different occasions in 2010 when rent was collected and never remitted; the complaint is quite specific in this regard identifying the property, tenant, amount of rent, who collected it, and the approximate dates on which the rent was collected. (*Id.*)

I could go on in substantially more detail summarizing the gist of Pringle's complaint – after all, it spans 92 pages and 221 numbered paragraphs, with a roughly equal number of

---

[3] One of the transactions occurred on September 22, 2009, so it actually postdated Sergio's and Marisa's bankruptcy filing. (DE 98 at 24.) All of the other 76 transfers predated it, however, so I'll generally refer to these transfers as occurring before the bankruptcy.

unnumbered subparagraphs.  However, for the purposes of the pending dismissal motions, that's

unnecessary.  As I'll explain below, I think that the foregoing alleged facts are sufficient to get

his case past the pleading stage and on to discovery.

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure, "a complaint must contain sufficient factual matter, accepted as true, to state a claim

to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal

quotations omitted); *accord Bell Atlantic Corp. v. Twombley*, 550 U.S. 544, 555 (2007).  I must

accept all factual allegations as true and draw all reasonable inferences in the complainant's

favor, but I don't need to accept threadbare legal conclusions supported by purely conclusory

statements.  *See Iqbal*, 556 U.S. at 678-79.

Furthermore, all of the claims that are implicated by the pending Motions to Dismiss

involve fraud-based conduct.[4]  Therefore, they are subject to the heightened pleading standard

set forth in Federal Rule of Civil Procedure 9(b), which requires a plaintiff to plead all

allegations of fraud with particularity.  *See Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d

580, 597 (7th Cir. 2001); *Kaye v. D'Amato*, 357 Fed. Appx. 706, 710 (7th Cir. 2009).  Pleading

with particularity means specifying the time, place, and content of the alleged false

representations, and the method by which the statements were made.  *See Slaney*, 244 F.3d at

597; *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir. 1992); *Kaye*, 357 Fed. App'x

---

[4] Not all conversion claims involve fraudulent behavior, of course.  *See, e.g., Executive Photo, Inc. v. Norrell*, 756 F. Supp. 798, 800-01 (S.D.N.Y. 1991) (noting that the conversion claim at issue didn't involve allegations of fraud).  In this case, however, Pringle's conversion claim is essentially one of theft by fraud, so it does.

at 710.

## ANALYSIS

As noted above, the Garcia I and II defendants ask me to dismiss four counts of Pringle's complaint: the criminal conversion claim, the federal and state RICO claims, and the fraudulent transfer claim. There are distinct differences and nuances in each of their arguments, but they all seem to break down to the same general point – Pringle has not pled sufficient facts to plausibly show that he has a cognizable claim. I disagree for the following reasons.

### Criminal Conversion Claim

This claim is perhaps the simplest claim to resolve. The Indiana criminal conversion statute (Ind. Code § 35-43-4-3) defines the crime of conversion to be the "knowingly or intentionally exert[ion of] unauthorized control over property of another person." *Id*. at (a). The Garcia I defendants argue that they do not meet this statutory definition because Pringle's decision to invest with the Garcias was a voluntary one, and the fact that it ultimately went south does not make it theft. (DE 106 at 7-8.)

This position has some allure to it; one could imagine a world in which the crime of conversion was defined so narrowly. If the purported victim agreed to turn over whatever he or she claimed was taken – at least absent physical threat or coercion – then it wouldn't be conversion. That's not to say that con men would be free to lie to and cheat their victims. It's just that their misconduct would be punishable on a fraud theory, not conversion.

But Indiana law is much broader than this. The term "unauthorized control" – as it is used Ind. Code § 35-43-4-3(a) – includes instances in which a person takes possession of another individual's property "by creating or confirming a false impression in the other person." *See*

9

Ind. Code § 35-43-4-1(b)(4); *accord Ruse v. Bleeke*, 914 N.E.2d 1, 8 (Ind. Ct. App. 2009).

The elements of the crime of theft by false impression are well-established. "Where the theft is committed by the creation of a false impression, the representations creating that false impression must be of past or existing fact and the party relinquishing control of the property must have relied on the misrepresentation." *Dunnuck v. State*, 644 N.E.2d 1275, 1278 (Ind. Ct. App. 1994) (*citing Deardorf v. State*, 477 N.E.2d 934, 938 (Ind. Ct. App. 1985)).

The question for me at the dismissal stage is straightforward, then. Has Pringle alleged facts sufficient to plausibly suggest that the Garcia I defendants misrepresented past or existing facts to him, and that he relied on those misrepresentations to surrender his property? With respect to Sergio, that answer is easy. Pringle's complaint alleges that at a bare minimum Sergio told him that his investment dollars would be used to acquire properties to be rehabbed and that prior investors had profited from Sergio's activities. (DE 98 at 30.) According to Pringle, this was an intentional misrepresentation, and the Garcias planned to use his funds to pay off his prior victims. (*Id.* at 30-35.)

Pringle also alleges in a separate vein that Sergio told him that Rehab Lending Tree was a successful enterprise that was in the business of making loans to purchasers of the rehabbed properties. (*Id.* at 37-38.) He says that Sergio provided him with two documents (a tax return and a borrower file) purporting to reflect this success. (*Id.* at 38.) Yet these were all lies according to Pringle. In fact, Rehab Lending Tree had not made any loans, and the documents were either altered or forged. (*Id.* at 38.)

Finally, Pringle's complaint alleges that he relied on all of these alleged misrepresentations and omissions when deciding to invest in both the real estate business and the

lending operation.  (*Id.* at 37, 39-40.)  That's enough under Indiana's criminal conversion statute, which requires only actual – and not reasonable or justifiable – reliance.  *See Snelling v. State*, 337 N.E.2d 829, 834 (Ind. Ct. App. 1975); *see also Harwei, Inc. v. State*, 459 N.E.2d 52, 57 n.7 (Ind. Ct. App. 1984) (stating general rule but finding no reliance).  I therefore conclude that Pringle's complaint more than adequately pleads an Indiana conversion claim against Sergio.

As for the other Garcia Entities, Pringle's theory seems to be that Sergio was acting as the agent for those companies. The question thus becomes whether (and when) a principal can be held liable for the fraudulent conduct of its agent.  Indiana law is clear on this issue.  "A principal is liable for any misrepresentations of his agent undertaken within the scope of the agency, whether or not the principal has knowledge of the fraud."  *Smith v. Brown*, 778 N.E.2d 490, 495 (Ind. Ct. App. 2002) (*citing Mid–Continent Paper Converters, Inc. v. Brady, Ware & Schoenfeld, Inc.*, 715 N.E.2d 906, 909 (Ind. Ct. App. 1999)).  Accordingly, on this basis, Pringle's criminal conversion claim against both the Garcia I defendants (other than Marisa, who is not implicated by it) will be allowed to proceed.

### Federal and State RICO Claims

The RICO analysis is a little more involved.  There are four elements to a civil RICO claim: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity.  *See Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006).  The phrase "racketeering activity" includes acts of mail fraud (18 U.S.C. § 1341) and bankruptcy fraud (18 U.S.C. § 152).  *See* 18 U.S.C. §§ 1961(1)(B) and (D).  A pattern of racketeering activity requires at least two acts within a ten-year period.  *Id.* at (5).

The Garcia I and II defendants argue that Pringle has failed to plead sufficient allegations

to establish the first, third and fourth of these elements.  They also contend that the predicate offenses identified in Pringle's complaint are too remote from his alleged injury. The best way to analyze these arguments is to break them up into a few separate questions.  First, does Pringle's complaint adequately allege the existence of an enterprise, and who are its members?  Next, does Pringle sufficiently allege that the enterprise committed at least two predicate acts that could form the basis for a pattern of racketeering?  And last, what is the connection between those acts and Pringle's alleged injury?  I'll address each of these questions in turn.

*The Garcia Family as an Enterprise*

The federal RICO statute defines an "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4); *accord Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389, 399 (7th Cir. 2009).  This case concerns a so-called "association-in-fact" enterprise.  That sort of enterprise "must have 'at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *Rao*, 589 F.3d at 399 (*quoting Boyle v. U.S.*, 556 U.S. 938, 946 (2009)).

As noted above, Pringle calls the enterprise in question the Garcia Family.  He alleges that all of the Garcia I and Garcia II defendants (as well as a number of additional individuals) participated in it, and he describes a number of specific acts that each defendant performed as part of this enterprise.

Pringle readily meets the *Boyle* requirements.  First, he adequately identifies two distinct purposes of the alleged enterprise – to induce potential investors (like Pringle) to invest with

Sergio and his companies, and then to steal assets and other funds that should be going to Sergio's and Marisa's creditors. (DE 98 at 41-45.) Second, most of the individual defendants – and all of the individual Garcia I and II defendants – are related to each other by blood or marriage, and it's hard to conceive of a more quintessential type of relationship than that. *See, e.g., Martinez v. Calimlim,* 651 F. Supp. 2d 852, 858 (E.D. Wis. 2009) (holding that familial relationships are sufficient); *Dexia Credit Local v. Cuppy*, No. 10 C 1563, 2010 WL 3257873, at *3 (N.D. Ill. Aug. 16 2010) (same). Finally, Pringle's complaint specifies various acts connected with the purported enterprise that occurred from September 2006 (when Pringle first met with Sergio) until at least November 1, 2010 (the last date on which the Garcias collected rent without turning it over to Sergio's and Marisa's conservator). This period of more than four years – and potentially much more than that – is enough to satisfy the third *Boyle* requirement. *See, e.g., In re ClassicStar Mare Lease Litig.*, 823 F. Supp. 2d 599, 636 (E.D. Ky. 2011) (noting that "several years" was sufficient); *Dexia Credit*, 2010 WL 3257873, at *3 (noting that "multiple years" was sufficient). Based on all of this, Pringle has alleged sufficient facts to state a plausible claim that the Garcia Family was an association-in-fact enterprise.

### Participants in the Garcia Family Enterprise

The next question asks which of the Garcia I and II defendants actually participated in the enterprise. As discussed extensively above, the complaint mostly focuses on actions taken by Sergio (on behalf of the Garcia Family), so there really is no question that he was a participant. Similarly, Pringle's complaint specifically asserts that the Garcia Entities were the conduits for Pringle's investment dollars, and that's sufficient to show that they were participants

as well.[5]

Marisa is a slightly harder call.  It's true that many of the allegations concerning her – especially the ones asserting that she conspired with Sergio to engage in the purported scheme to defraud Pringle – fairly could be characterized as conclusory in nature.  If this was all that Pringle could say, it would be a close question whether he had pled her participation in the Garcia Family enterprise with sufficient particularity.  But that's not all that he alleges.  Pringle also identifies Marisa as the grantor or transferor in many of the (purportedly illicit) transactions that he says constituted fraudulent transfers.  (DE 98 at 14-26.)  Pringle further claims that Marisa was the one who signed the checks that were used to fraudulently disburse their estate's funds during the bankruptcy proceedings.  (*Id.* at 74.)  These actions are enough to implicate her in the enterprise, at least at the dismissal stage.

That takes me to Elva and her company, Alpha & Omega.  They present the most difficult question, for two reasons.  First, Elva is more removed from Sergio and the Garcia Entities than Marisa – she is his daughter, not his wife, and she isn't a member of all of the companies.  Second, the only conduct-based allegations implicating Elva and Alpha & Omega concern their receipt of some of the transferred properties involved in the purported bankruptcy fraud.  This passive acceptance of properties is less suspicious than what Marisa and Sergio (allegedly) did, and in any event, there's no equivalent allegation to Marisa's signing the checks that were used to siphon off bankruptcy estate funds.

_____

[5] I note, however, that it's unlikely that Sergio and the Garcia Entities could form a RICO enterprise all by themselves.  That's because courts generally don't view a corporation and its owners (or employees) as sufficiently distinct from one another to constitute a RICO enterprise.  *See, e.g., Bachman v. Bears, Stearns & Co.*, 178 F.3d 930, 932 (7th Cir.1999) ("A firm and its employees, or a parent and its subsidiaries, are not an enterprise separate from the firm itself").

Still, I think there's enough in the complaint to plausibly suggest that Elva was involved in the RICO enterprise. What tips the scale for me is the number and nature of the transferred properties. This isn't a case where a debtor gives his child a single gift prior to declaring bankruptcy – in that case, the recipient might have a believable claim that he or she was unaware of any wrongdoing when accepting it. Here, however, Alpha & Omega received *thirty-three* properties from the Garcias. That's just too many to think that the company and its owner (Elva) were unaware of the reason why the Garcias were unloading their assets. Put differently, the allegation that Alpha & Omega participated so extensively in the purportedly fraudulent property transfers at issue in this case provides adequate factual support for Pringle's otherwise conclusory claim that the company and Elva were participants in the Garcia Family enterprise.

Having said all that, I need to address one issue not raised by the parties. The Supreme Court has long interpreted the applicable RICO provision (18 U.S.C. § 1962(c)) to require more than mere participation in the activities of an enterprise. Instead, it requires that a RICO defendant must have some part in *directing or managing* those affairs, though the defendant need not have the primary responsibility for doing so. *See Reves v. Ernst & Young*, 507 U.S. 170, 177-79, 183-85 (1993); *U.S. v. Cummings*, 395 F.3d 392, 397-99 (7th Cir. 2005). It's at least questionable in this case whether Pringle has alleged sufficient facts to suggest that Elva and Alpha & Omega had the necessary input in the Garcia Family's direction or management. To be sure, the allegation that Alpha & Omega received dozens of properties from the Garcia Entities shortly before Sergio and Marisa filed for bankruptcy strongly suggests that they *participated* in the Garcia Family's purported bankruptcy fraud. But mere participation isn't enough. *See Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 727 (7th Cir. 1998).

15

The problem is that the Garcia II defendants didn't make this argument, and so it is waived for purposes of the present motion. And I am reluctant to dismiss a complaint based on a theory that wasn't raised by the parties. But as the case progresses, Pringle needs to uncover some evidence that Elva played a role in the management and direction of the Garcia Family and wasn't merely the willing beneficiaries of its largesse. If he fails to do so, Elva (and her company) are free to raise the "operation and management" issue during summary judgment.

*Predicate Acts*

A civil plaintiff asserting a federal RICO claim must establish that the enterprise in question committed at least two predicate acts of racketeering activity occurring within ten years of each other. *See* 18 U.S.C. § 1961(5); *DeGuelle v. Camilli*, 664 F.3d 192, 199 (7th Cir. 2011). Pringle alleges that the Garcias engaged in six such acts: (1) commission of wire fraud by using wire transfers to accept $1.8 million from Pringle; (2) commission of mail fraud by using the mail system to accept $100,000 from Pringle; (3) commission of mail fraud by using the mail system to effectuate the fraudulent transfer of dozens of properties; (4) commission of bank fraud by failing to disclose any liabilities to Pringle when obtaining a loan; (5) commission of bankruptcy fraud by concealing assets and income from their creditors and by fraudulently transferring assets shortly before filing for bankruptcy; and (6) commission of wire fraud by sending via facsimile various documents involved in their alleged scheme to defraud Pringle. (DE 98 at 45-83.)

Any of these alleged offenses would be enough – if proven – to constitute a predicate act. *See* 18 U.S.C. 1961(1)(B) and (D). It is important to note, however, that four of them seem to involve the same scheme – the alleged attempt to induce Pringle to invest with the Garcias. In

that scenario (*i.e.*, multiple alleged offenses flowing from the same scheme, usually in quick succession), it's generally inappropriate to view each act as a separate predicate for civil RICO purposes. *See, e.g., Roger Whitmore's Auto. Servs., Inc. v. Lake County, Ill.*, 424 F.3d 659, 673-74 (7th Cir. 2005); *Oak Street Mortg., LLC v. Fundz R Us, Inc.*, No. 3:06-CV-0491, 2007 WL 1970890, at *6 (N.D. Ind. July 2, 2007). Therefore, I'll construe Pringle's complaint as essentially encompassing three main schemes: that the Garcias intended to swindle Pringle out of his investment funds, that they intended to defraud a bank by concealing their true assets and liabilities when taking out a loan, and that they intended to defraud the bankruptcy court and their creditors by siphoning off assets before declaring bankruptcy and concealing income after the proceedings had commenced.

The question for me at the dismissal stage, then, is whether Pringle has pled enough facts to state a plausible claim that at least two of those schemes involved the commission of a predicate act of racketeering. I reiterate that because all of these potential acts involve fraud, Rule 9(b)'s heightened particularity requirement applies. *See, e.g., Slaney*, 244 F.3d at 597.

The first predicate act is easy to find. Pringle's complaint alleges that the Garcias used wire transfers and the mail to accept nearly $2 million from Pringle. (DE 98 at 45-50.) That seems like a pretty clear cut case of wire and mail fraud. The elements of those offenses are straightforward: a defendant must (1) participate in a scheme to defraud; (2) have the intent to defraud; and (3) use interstate wires or the mail to further that fraud. *See U.S. v. Sheneman*, 682 F.3d 623, 628 (7th Cir. 2012) (wire fraud); *U.S. v. Boisture*, 563 F.3d 295, 299 (7th Cir. 2009) (mail fraud). As I noted above, Pringle's complaint paints a vivid and detailed picture of a massive scheme by Sergio and others to defraud Pringle out of millions of dollars by inducing

him to invest in what turned out to be phantom real estate purchases. Pringle identifies multiple instances in which he used interstate wire transfers and the U.S. mail system to transfer a substantial portion of the funds in question. (DE 98 at 45-50.) That's more than enough.

The second predicate act is more complicated. Pringle essentially alleges that the Garcias collected rent from at least seven tenants and failed to turn it over to the bankruptcy conservator as required by the bankruptcy court's order. (DE 98 at 55-65.) He asserts that they filed a fraudulent verified statement with the bankruptcy court claiming that substantially all of this money was used to repair the properties in question, but that no such repairs ever occurred. (*Id.* at 66-74.) Although Sergio and Marisa submitted an invoice for the repairs, Pringle claims that this document – which apparently was prepared by a company owned by Sergio's sister and her husband – was a sham. (*Id.* at 70-71.)

These alleged facts are sufficient to state a plausible bankruptcy fraud claim. The federal statute addressing bankruptcy fraud makes it a crime for someone to "knowingly and fraudulently conceal[] from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or, in connection with a case under title 11, from creditors or the United States Trustee, any property belonging to the estate of a debtor." 18 U.S.C. § 152(1). This begs two questions – was the rental income allegedly withheld by the Garcias their property for the purposes of § 152(1), and if so, are Pringle's factual allegations sufficient to suggest that the withholding of it was knowing and fraudulent?

With respect to the first issue, the Bankruptcy Code specifically defines a debtor's property to be "proceeds, product, offspring, *rents, or profits of or from the property of the estate*." 11 U.S.C. § 541(a)(6) (emphasis added). This means that any rental income generated

from the assets held by a bankruptcy estate will be deemed to be the property of that estate. *See Matter of Heath*, 115 F.3d 521, 523 (7th Cir. 1997). And indeed, cases from other circuits recognize that knowingly and fraudulently concealing rental income can constitute bankruptcy fraud. *See, e.g., United States v. Ladum*, 141 F.3d 1328, 1340 (9th Cir. 1998) (concealing rental income is bankruptcy fraud); *see also United States v. McIntosh*, 124 F.3d 1330, 1334-35 (10th Cir. 1997) (concealing investment income can constitute bankruptcy fraud).

That brings me to the second question of whether Pringle alleges facts sufficient to show that the Garcias acted knowingly and fraudulently when they withheld the rent. I think that he does. Pringle identifies seven separate properties that he believes generated rent, including the tenants and the approximate dates on which rent was paid. Furthermore, he also alleges that Sergio and Marisa submitted a false verified statement and a sham invoice to the bankruptcy court. That's a real key for me. If the only allegation was that the Garcias were collecting rent during their bankruptcy, then I would hesitate to conclude that this conduct was knowingly fraudulent, especially given Rule 9(b)'s more stringent pleading requirement. After all, they might just be unaware that they needed to turn over the income to the conservator. But Pringle does more than that. He alleges that Sergio and Marisa outright lied to the bankruptcy court by saying that they had used the rent to make repairs (when they hadn't), and that they created a fictitious document to support that claim. That's more than enough to suggest knowing and fraudulent behavior under the strictest of pleading standards.

Therefore, I conclude that Pringle sufficiently pleads facts to show that the Garcia Family engaged in at least two predicate acts for RICO purposes – mail and wire fraud during their alleged scheme to defraud Pringle, and then bankruptcy fraud during their efforts to siphon off

assets while undergoing bankruptcy.  As such, Pringle has adequately alleged that the Garcia Family engaged in a pattern of racketeering.

*Proximate Cause*

The final RICO argument raised by the Motions to Dismiss involves the issue of causation.  "A RICO plaintiff's injuries must be 'by reason of' a violation of § 1962.  This requires a showing of 'but for' causation and proximate cause."  *See, e.g., DeGuelle*, 664 F.3d at 199 (*citing Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1005 (7th Cir. 2004)) (citation to RICO statute omitted).  In other words, a RICO plaintiff must show both that but for the defendants' conduct he or she wouldn't be injured, and that there is a direct relationship between the injury and the alleged wrongdoing.  *See Corley*, 388 F.3d at 1005.

The Garcia I and II defendants offer a boilerplate argument that Pringle has not established the requisite causation.  I'm not sure why they bothered.  One of the alleged schemes of the Garcia Family was to induce Pringle to invest in the Garcia Entities.  He did that to the tune of almost $5 million.  Yet Pringle hasn't seen any of that money repaid because (he says) the Garcias lied about what they were going to do with it.  What else – other than the enterprise's scheme to defraud him – could possibly be the cause of Pringle's injury?

*State RICO Claims*

Before I leave the RICO analysis, I need to address the Garcias' potential liability under the Indiana RICO act.  The Garcia I defendants assert that the state provision is patterned after its federal counterpart, and therefore the analysis in substantially similar.  (DE 106 at 13.) Pringle concurs with this characterization.  (DE 149 at 24-25.)

They're both wrong.  In fact, the Indiana Supreme Court expressly held in 2008 that the

Indiana RICO statute is significantly broader than its federal equivalent. *See Kesling v. Beegle*, 880 N.E.2d 1202, 1206-08 (Ind. 2008). The *Kesling* court specifically concluded that the state RICO provision doesn't contain the *Reves* requirement that a RICO defendant must exert some degree of management or direction over the enterprise. *Id.* Instead, mere participation *will* be enough. *Id.* at 1206 ("We conclude that the Legislature intended for the Indiana Act to reach persons 'below the managerial or supervisory level' as well as those who 'exert control or direction over the affairs of [a racketeering] enterprise,' *i.e.*, to reach a racketeering enterprise's 'foot soldiers' as well as its 'generals'" (citations omitted).).

That makes the state RICO claim easier to prove than its federal counterpart. And because I have found that the complaint plausibly pleads a federal RICO claim, the state RICO claim must necessarily also go forward.

* * *

Therefore, for the reasons set for above, the requests that I dismiss the state and federal RICO claims against the Garcia I and II defendants are denied. All of these RICO claims will move past the dismissal stage.

### Indiana Uniform Fraudulent Transfer Act Claims

I'll turn at last to the first claim challenged by the Motions to Dismiss – Pringle's allegation that in the years and months before Sergio and Marisa declared bankruptcy, they engaged in a systematic effort to deplete the assets of their estate by giving away their properties, largely through transfers involving the Garcia Entities. A party asserting such a fraudulent transfer claim can go about it in one of two ways. He can show that the transfer was made with the actual intent to defraud creditors, or he can show that the transferor received insufficient

consideration in exchange for the transfer.  *See* Ind. Code §§ 32-18-2-14 and 32-18-2-15; *Rice v. Com'r, Ind. Dep't of Envtl. Mgmt.*, 782 N.E.2d 1000, 1004 (Ind. Ct. App. 2003).[6]  Pringle is proceeding under both theories in this case.

First, he alleges that the Garcias actually intended to defraud him.  "A conveyance of real estate 'made with the intent to hinder, delay or defraud creditors or other persons of their lawful damages' shall be void as to the person sought to be defrauded."  *Med. & Prof'l Collection Servs., Inc. v. Bush*, 734 N.E.2d 626, 630 (Ind. Ct. App. 2000).  A plaintiff asserting such a claim must prove that the transfer in question was made with fraudulent intent.  *Id.*; *Kourlias v. Hawkins*, 287 N.E.2d 764, 766 (Ind. Ct. App. 1972).

Indiana courts are clear that it isn't enough to show that a transfer was made for insufficient consideration.  *See Diss v. Agri Bus. Intern., Inc.*, 670 N.E.2d 97, 100 (Ind. Ct. App. 1996).  Instead, fraudulent intend can be inferred from a number of so-called "badges of fraud."  *See Bush*, 734 N.E.2d at 630.  These include:

- the transfer of property by a debtor during the pendency of a suit;

- a transfer of property that renders the debtor insolvent or greatly reduces his estate;

- a series of contemporaneous transactions which strip a debtor of all property available for execution;

- secret or hurried transactions not in the usual mode of doing business;

- any transaction conducted in a manner differing from customary methods;

---

[6] Pringle is asserting fraudulent transfer claims under two similar but distinct statutes – Indiana Code §§ 32-18-2-14 and 32-18-2-15.  The main differences between these two statutes concern the timing of the debtor's obligation to the creditor who is suing and precisely what that creditor must show if he or she is pursuing a constructive fraud theory.  In this case, the analysis is largely the same for both statutes.

- a transaction whereby the debtor retains benefits over the transferred property;

- little or no consideration in return for the transfer;

- a transfer of property between family members.

*Id.*; *Otte v. Otte*, 655 N.E.2d 76, 81 (Ind. Ct. App. 1995). There isn't any hard and fast rule about how many of these badges must exist in order for fraudulent intent to be inferred; rather, they must be evaluated holistically on a case-by-case basis. *See Bush*, 734 N.E.2d at 630; *Otte*, 655 N.E.2d at 81. In other words, I need to consider the badges together to see how many are present and if together they amount to a pattern of fraudulent intent. *See Greenfield v. Arden Seven Penn Partners, L.P.*, 757 N.E.2d 699, 703-04 (Ind. Ct. App. 2001) (*quoting Otte*, 655 N.E.2d at 81).

Pringle clears that hurdle here. For starters, he clearly alleges that the transfers at issue in the case were made between family members. He also says that the transfers caused Sergio and Marisa to become insolvent, although this perhaps is alleged in an arguably conclusory way. (DE 98 at 27). Pringle further claims that the transfers were made for inadequate consideration. (*Id.*) And while his complaint never says what that consideration was, Pringle does suggest in his response to the Motions to Dismiss that he believes many of the transfers were for no consideration (*i.e.*, they were giveaways).

So one "badge of fraud" – transfers between family members – is alleged with more than adequate specificity, and two others are also suggested, albeit in a perhaps more conclusory way. I think that's enough to allege an actual intent to defraud.

As for Pringle's constructive fraud claim, section 32-18-2-14 of the Indiana Code specifies that a transfer is fraudulent – even absent actual intent – if the transferor received less

than the reasonable value and "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" or "intended to incur or believed or reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as the debts became due." *Id.* at (2). Similarly, pursuant to Indiana Code § 32-18-2-15, a transfer will be fraudulent if the transferor received less than reasonable value and "was insolvent at that time" or "became insolvent as a result of the transfer or obligation." *Id.* at (2). Pringle says in his complaint that the value of the consideration received for the transferred properties was insufficient.

Although the fraudulent transfer claims could have been drafted with more specificity (*i.e.*, Pringle could have explained what he believes the consideration was, or why he believes it was insufficient), I'm inclined to let them claims go past the dismissal stage. From an entirely pragmatic point of view, Pringle's conversion and federal and state RICO counts are going forward no matter what. Dismissing the fraudulent transfer claims therefore wouldn't really save me or the parties much time or hassle. The same individuals and entities are still going to be litigating this case for the foreseeable future under any circumstance.

More importantly, the dismissal briefing makes it pretty clear to me that there's a bona fide factual dispute over whether the Garcias received *anything* for the transferred properties, notwithstanding Pringle's somewhat opaque pleading on this subject. Specifically, in his responses to the Motions to Dismiss, Pringle expressly states that he doubts that the transferees paid *any* consideration. (DE 150 at 6.) The Garcia I and II defendants counter that assertion by constructing a hypothetical scenario in which a property worth $20,000 but encumbered by a $30,000 mortgage is transferred for no consideration, arguing that such a deal would not be a

fraudulent conveyance.  (DE 152 at 3.)

These are disputes that are best left for resolution at the time of summary judgment when I will be dealing with facts, not allegations or hypotheticals.  So I will set aside any reservations for the time being and deny the Motions to Dismiss the fraudulent transfer claims against the Garcia I and II defendants.  But in doing so I caution Pringle that if he cannot adduce concrete evidence that insufficient consideration was paid to the transferees of the Garcias' properties, I won't hesitate to dispose of his fraudulent transfer claims during summary judgment proceedings.

There's a final issue to address.  In their Motion to Dismiss, the Garcia II defendants argue that only a debtor-transferor – and not a transferee – can be liable under the Indiana fraudulent transfer statutes.  Pringle responds by citing *Rose v. Mercantile Nat'l Bank of Hammond*, 868 N.E.2d 772 (Ind. 2007), in which a transferee was found to be liable for a fraudulent transfer.  *Id.* at 776-77.  The Garcia II defendants switch gears slightly in their reply, acknowledging that such a transferee *can* be held liable, but only when he or she actually participated in the fraudulent transfer – which (they claim) Elva and Alpha & Omega didn't do in this case.

That essentially takes me back to a question that I previously answered.  Has Pringle alleged sufficient facts to plausibly suggest that Elva and Alpha & Omega actively participated in the Garcia Family's illicit conduct?  As I noted above, if Alpha & Omega had been the transferee in only one or two of the transfers (and not 33 of them), I very well might reach a different conclusion.  But Pringle backs up his assertion that Elva and her company were involved by identifying nearly three dozen transactions in which properties were transferred

from one of the Garcia Entities to Alpha & Omega, all in a purported attempt to siphon assets from Sergio's and Marisa's estate. The fact that there were so many transfers is enough to plausibly suggest that the Garcia II defendants were involved in whatever shady business may have been occurring. Accordingly, I'll find that Pringle has alleged sufficient facts to state a plausible fraudulent transfer claim against all of the Garcia I and II defendants.

## CONCLUSION

Therefore, for all of the reasons set forth above, the Motions to Dismiss (DE 105; DE 113) are **DENIED**.

**SO ORDERED.**

ENTERED: February 13, 2013.

s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
