UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| BARBARA V. PRINGLE, Independent Executor for the Estate of Arthur D. Pringle III, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 2:09-cv-022-PPS-PRC ) |
| JOE WITTIG, *et al.*, | ) ) ) |
| Defendants. | ) |

## OPINION AND ORDER

Barbara Pringle claims that Sergio Garcia cheated her deceased husband, Arthur, out of millions of dollars in a real-estate-based fraud scheme and that Joe Wittig participated in the scheme by buying twenty-two properties from Garcia while Garcia's real estate scheme was collapsing. According to the complaint, these were fraudulent transfers which Pringle seeks to have undone. Wittig has moved for summary judgment, arguing Pringle has not come forward with evidence of fraud [DE 261]. For the most part, I agree with Wittig. But two of the transactions stick out as suspicious. Because I find that there are unresolved issues of fact with respect to these two properties, Wittig's motion is **GRANTED IN PART** and **DENIED IN PART**.

### BACKGROUND

It's not necessary to rehash all of Sergio Garcia's misdeeds for the purposes of this motion. Anyone looking for a more complete account of the Garcia and his family's activities can refer to my November 25, 2013 Order in this case [DE 250]. Suffice it to

say for present purposes that Garcia was a real estate investor who operated in Northwest Indiana through a variety of corporations under his control. He bought houses in the area, rehabilitated them, and sold them—or at least that was what he was supposed to do.

Arthur Pringle, the original plaintiff in this suit, invested nearly $5 million with Garcia's companies between September 2006 and May 2008. Garcia was able to scrape together enough money to pay the interest on these loans up until August 2008, at which point, he stopped paying altogether. Pringle accelerated the payments on Garcia's promissory notes, but Garcia still didn't pay. So Pringle filed this lawsuit to recover on the notes, but he also alleged that the Garcia family was a RICO organization that had conspired to defraud investors like himself. Wittig was added as a defendant in the Second Amended Complaint [DE 60]. The Complaint alleged that Wittig helped Garcia shield assets from creditors by buying houses from Garcia on the cheap. Pringle alleged the transactions between Wittig and Garcia were fraudulent and sought to void them.

Wittig is also a Northwest Indiana real estate investor. He operates almost exclusively in the northern part of Lake County in cities like Gary, Hammond, and Lake Station. Like Garcia, Wittig buys existing houses and fixes them up. Unlike Garcia, Wittig doesn't sell the properties; he keeps them and rents them out. As Wittig explains it, Garcia operated like a wholesaler, building up a large inventory of houses and selling them off in lots to investors like Wittig. Wittig operates more like a retailer, selling or

renting directly to consumers. These houses are not palaces. Quite the opposite. According to Wittig, he owns around 100 properties in Gary and the vast majority cost him less than $15,000.

Garcia started selling houses to Wittig in September 2008, right after he stopped paying Pringle. Wittig ultimately bought twenty-six houses from Garcia's companies, but only twenty-two of the transactions are alleged to have been fraudulent. Wittig bought twenty-one of these between September 2008 and December 2008, and the final one in September 2009. The houses were located in Gary, Griffith, Hammond, Hobart, Lake Station and Merrillville, Indiana. All but one of the properties had existing mortgages, which Wittig assumed and satisfied as part of the transaction. Like the rest of Wittig's properties, these were cheap — most cost less than $15,000. As one would expect, the houses were in rough shape and required extensive rehabilitation before Wittig was able to rent them out.

Pringle alleges Wittig is liable under the Indiana Fraudulent Transfers Act, Ind. Code §§ 32-18-2-14 and 32-18-2-15 [DE 98]. She seeks the avoidance of the twenty-two transactions, an injunction against the disposal of any income derived from the transactions, and a declaratory judgment deeming the transfers fraudulent.

This case has gone through many twists and turns on its way to resolution. There have been several bankruptcy stays, and a gigantic judgment has already been issued against Garcia and his related entities on the counts relating to recovering on the notes. The RICO claim remains pending but it too has been stayed due to a likely

criminal prosecution of Sergio Garcia. (I have been told by the parties that the U.S. Attorney for this district has been calling people into a grand jury investigating Sergio Garcia's real estate activities). Plaintiff's case against Wittig, however, is not stayed. Wittig has moved for summary judgment, and the motion is ripe for disposition.

## DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material facts exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, I must construe all facts and draw all reasonable inferences from the record in the light most favorable to the nonmoving party. *Id.* at 255. But the nonmoving party is not entitled to the benefit of "inferences that are supported by only speculation or conjecture." *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (citations and quotations omitted).

In Indiana, an action to set aside a fraudulent conveyance is governed by Indiana's Uniform Fraudulent Transfer Act ("IUFTA") Ind. Code § 32-18-2, *et seq*. Fraudulent conveyance actions "have for their sole purpose the removal of obstacles which prevent the enforcement of the judgment" and are "in essence an equitable execution comparable to proceedings supplementary to execution." *Rice v. Com'r, Ind. Dep't of Envtl. Mgmt.*, 782 N.E.2d 1000, 1004 (Ind. Ct. App. 2003) (citation omitted). An

4

action to set aside a fraudulent conveyance does not negate the disputed transaction; its only effect is to subject the conveyed property to execution "as though it were still in the name of the grantor." *Id.*

A party asserting such an IUFTA claim can go about it in one of two ways. She can show that the transfer was made with the actual intent to defraud creditors, or she can show that the transferor did not receive "reasonably equivalent value" in exchange for the transfer. *See* Ind. Code §§ 32-18-2-14 and 32-18-2-15; *Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 792 (7th Cir. 2009); *Rice,* 782 N.E.2d at 1004. The first is commonly known as an actual fraud claim, whereas the second is known as a constructive fraud claim. Pringle alleges both. I'll start with the constructive fraud theory.

Section 32-18-2-15 permits recovery if 1) a debtor transfers property without receiving reasonably equivalent value in exchange for the transfer and 2) the debtor was insolvent or became insolvent as a result of the transfer. *See* Ind. Code § 32-18-2-15; *Rose v. Mercantile Nat'l Bank*, 844 N.E.2d 1035, 1053-54 (Ind. Ct. App. 2006), *vacated in part on other grounds*, 868 N.E.2d 773 (Ind. 2007). Section 32-18-2-14 operates the same way. *See* Ind. Code § 32-18-2-14(2).

There's no real debate over Garcia's insolvency. Pringle provided bankruptcy schedules filed by Sergio Garcia and two of his companies in 2009 as evidence [DE 276-1; 276-2; 276-3]. And these do indeed show that Garcia and his entities were broke. In the fall of 2008, Garcia owed millions to Arthur Pringle and was unable to pay even the

interest on his loans [DE 250].  Meanwhile, the nation's economy was in crisis and the housing market had collapsed, wiping out much of the value of Garcia's real estate holdings [DE 266-9; 266-10].  So solvency is not the real issue here.

The key dispute is whether Wittig provided "reasonably equivalent value" for the twenty-two houses he bought.  The term isn't defined in the IUFTA statute so I have to look to decisions construing other states' uniform fraudulent transfer acts, as well as decisions construing the fraudulent transfer provisions of the Bankruptcy Code in order to figure out whether the terms of the transactions met the threshold. *See In re Image Worldwide*, 139 F.3d 577, 580 (7th Cir. 1998).

For starters, "reasonably equivalent value" requires something more than consideration to support a contract. *Id.* at 576.  Besides this lower bound, however, there is no fixed mathematical formula. *See Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir. 1997).  Rather, I need to consider factors such as whether the transaction took place at arm's length, the good faith of the transferee, and, most importantly, the fair market value of what was transferred and received. *See id.*

Wittig makes a strong case that he paid fair market value for each house.  He didn't pay much, but he says the prices were reasonable, in line with the rest of his inventory, and in line with prices in the highly depressed Gary, Indiana market [DE 266-8 ¶¶ 12, 17].  Further, the transactions took place during the midst of the housing market crash, which hit northwest Indiana hard.  As a result, these houses, like many in

6

the area, were unoccupied. *See id.* ¶21. Many had been vandalized and were badly in need of repair, which further depressed their value. *Id.*

What's more, the cash price was only part of the benefit Garcia received in the bargain. Twenty-one of the properties had mortgages. *Id.* ¶15. And Wittig assumed and satisfied these mortgages as part of each sale, relieving Garcia of hundreds of thousands of dollars in mortgage payments or, more probably, foreclosure. *Id.* ¶¶ 16-17. He also relieved Garcia of real estate tax liability, insurance and maintenance expenses. Since the houses were unoccupied and in crime-ridden areas, the maintenance expenses were likely considerable. In Wittig's telling, Garcia got one heck of a bargain.

In response to Wittig's credible and detailed affidavit in support of summary judgment, Pringle's riposte is a single piece of evidence: the 2010 Lake County Real Property Maintenance Reports [DE 276-4]. The reports contain the Lake County Assessor's assessed tax value for each property and they show that Wittig only paid a fraction of the assessed value of the houses - anywhere from 15 to 40 percent.

The problem with this evidence is that assessed values of the properties do not reflect their fair market value and are not meant to. Indiana's county assessors estimate a property's "true tax value," not its fair market value. *Kooshtard Prop. VI, LLC v. White River Twp. Assessor*, 836 N.E.2d 501, 504 (Ind. T.C. 2005); *Robey v. Fairfiled Twp. Assessor*, 918 N.E.2d 29 (Ind. T.C. 2009). And the property tax statute itself even warns that true tax value should not be confused with fair market value. *See* Ind. Code § 6-1.1-31-6 ("true tax value does not mean fair market value . . . [it] is the value determined under

7

the rules of the department of local government finance."). Assessors follow a series of state-published guidelines that generate a quick-and-dirty property assessment by estimating the value of the land as if it were vacant and then adding the depreciated costs of any improvements. *See Kooshtard Prop.*, 836 N.E.2d at 504-505; *Eckerling v. Wayne Twp. Assessor*, 841 N.E.2d 674, 676 (Ind. T.C. 2006). They generally do not look to actual market data like comparable sales unless a taxpayer challenges the assessment. *Kooshtard Prop.*, 836 N.E.2d at 504; *Fid. Fed. Sav. & Loan v. Jennings Cty. Assessor*, 836 N.E.2d 1075, 1082 (Ind. T.C. 2005). And, like bureaucrats everywhere, county assessors are trying to do a big job on limited resources. *See Eckerling*, 841 N.E.2d at 677 (noting Indiana assessors often operate under the constraints of limited time and resources due to Indiana's mass appraisal system). As a result, the assessed values of these homes tell us very little about their actual market value.

Wittig argues that this tax evidence is irrelevant and ought to be excluded. That overstates the case; the evidence is relevant, it's just weak. Pringle hasn't come forward with any strong evidence of the type that one would expect in a case like this. There are no independent appraisals, no evidence of comparable sales, no testimony from real estate agents. Perhaps that's because this kind of strong objective evidence doesn't exist. Arthur Pringle testified that there were no accurate appraisals for the area after 2006 [DE 266-7 at 33]. Or it could be that this objective evidence is unfavorable to Pringle. The evidence from the mortgage-holder, Smith Rothchild Financial Company, certainly suggests that this could be the case. Smith Rothchild was willing to accept

pennies on the dollar to settle the mortgages it held on twenty-one of the properties rather than foreclose and try to sell the properties itself [DE 268-8 at 4-5]. For example, Smith Rothchild accepted $3,814.63 to settle an $80,950.00 mortgage on the properties at 4200 and 4206 Adams Street, in Gary. *Id.* To me this suggests that Smith Rothchild believed that the properties' combined value was closer to the $21,000 Wittig paid for them then the $105,400 assessed value.

Once Wittig produced credible evidence that there was no genuine issue of material fact and he was entitled to judgment as a matter of law, the burden shifted to Pringle. But for whatever the reason, Pringle failed to come forward with convincing evidence to prove that questions of fact existed. The burden was hers to carry and the tax assessments, by themselves, do not do the job. *See Delta Consulting Grp., Inc. v. R. Randle Const., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009) ("The existence of merely a scintilla of evidence in support of the non-moving party's position is insufficient; there must be evidence on which a jury could reasonably find for the non-moving party."). Since Pringle has not carried her burden, summary judgment is appropriate on the constructive fraud claim.

In addition to constructive fraud, Pringle also alleges Garcia and Wittig engaged in actual fraud. IUFTA voids real estate conveyances that were "made with the intent to hinder, delay or defraud any creditor of the debtor." *See* Ind. Code § 32-18-2-14; *Med. & Prof'l Collection Servs., Inc. v. Bush*, 734 N.E.2d 626, 630 (Ind. Ct. App. 2000). A plaintiff asserting an actual fraud claim must prove that the transfer in question was

9

made with fraudulent intent. *Id*.; *Kourlias v. Hawkins*, 153 Ind.App. 411, 287 N.E.2d 764, 766 (Ind. Ct. App. 1972). Fraudulent intent is inferred from a number of so-called badges of fraud. *See Bush*, 734 N.E.2d at 630. These include:

- the transfer of property by a debtor during the pendency of a suit;

- a transfer of property that renders the debtor insolvent or greatly reduces his estate;

- a series of contemporaneous transactions which strip a debtor of all property available for execution;

- secret or hurried transactions not in the usual mode of doing business;

- any transaction conducted in a manner differing from customary methods;

- a transaction whereby the debtor retains benefits over the transferred property;

- little or no consideration in return for the transfer;

- a transfer of property between family members.

*Id*.; *Otte v. Otte*, 655 N.E.2d 76, 81 (Ind. Ct. App.1995).

There isn't any hard and fast rule about how many of these badges must exist in order for fraudulent intent to be inferred; rather, they must be evaluated holistically on a case-by-case basis. *See Bush*, 734 N.E.2d at 630; *Otte*, 655 N.E.2d at 81. In other words, I need to consider the badges together to see how many are present and if together they amount to a pattern of fraudulent intent. *See Greenfield v. Arden Seven Penn Partners, L.P.*, 757 N.E.2d 699, 703-04 (Ind. Ct. App. 2001) (quoting *Otte*, 655 N.E.2d at 81).

Pringle argues that the lack of consideration and the number of transactions suggest that all twenty-two transactions were fraudulent. I don't buy it. As I explained above, there's no real evidence Wittig paid less than what the houses were worth. And Pringle has not come forward with any evidence supporting the contention that the number of transactions was unusual. Wittig argues that selling off properties in large lots was just what dealers like Garcia did, and he points to the fact that Garcia still owned over one hundred properties in 2009 to support the argument that the sale of twenty houses over the course of a couple months was not unusual [DE 276-1; 276-2; 276-3]. That makes a certain amount of sense to me, and, without evidence to the contrary, I have no reason not to accept it. So Pringle has not established a claim of actual fraud for the majority of transactions.

She has, however, provided evidence supporting badges of fraud associated with two transactions in particular. Pringle points to the strange circumstances surrounding the sale of two properties: 427 S. Liberty Place in Hobart and 3325 Massachusetts Street in Gary. What happened was Garcia sold the properties to Wittig. Then, that same day, Wittig turned around and sold them to Garcia's IRA [DE 276-6 at 15-21]. Pringle suggests Wittig was acting as a straw purchaser to help Sergio Garcia avoid the self-dealing limitations on Garcia's IRA and thus shield the properties from creditors. This sure looks like a "secret or hurried transactions not in the usual mode of doing business." *Bush*, 734 N.E.2d at 630. The issue of adequate consideration is also in dispute here since it seems *very* unlikely that Wittig actually paid Garcia the $52,000.00

he purportedly paid for the privilege of owning the houses for an afternoon. Especially since Wittig admits he was just acting as "a middleman" for Garcia [DE 276-6 at 21]. Moreover, the timing is suspect, since the sales occurred a couple of months after Garcia stopped paying Pringle.

Naturally Wittig denies any intent to defraud. That may be the case, but Pringle has come forward with enough evidence to make this a genuine factual dispute, at least with respect to these two properties. This will have to be resolved at trial.

## CONCLUSION

Wittig's Motion for Summary Judgment [DE 261] is **GRANTED IN PART** and **DENIED IN PART**. Summary Judgment is **DENIED** with respect to the Fraudulent Transfer Act claims concerning the properties at 427 S. Liberty Place, Hobart, Indiana and 3325 Massachusetts Street, Gary, Indiana. Summary Judgment is **GRANTED** with respect to Pringle's remaining claims against Wittig.

**SO ORDERED.**

ENTERED: August 26, 2014.

s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT